# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 39936**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Evan L. WESTCOTT**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 17 March 2022

––––––––––––––––––

*Military Judge:* Bryon T. Gleisner.

*Sentence:* Sentence adjudged on 16 January 2020 by GCM convened at Pope Army Airfield, North Carolina. Sentence entered by military judge on 29 May 2020: Dishonorable discharge, confinement for 3 years, and reduction to E-1.

*For Appellant:* Captain David L. Bosner, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Alex B. Coberly, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and MEGINLEY, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court. Chief Judge JOHNSON filed a separate opinion concurring in part and in the result. Judge MEGINLEY filed a separate opinion dissenting in part and in the result.

––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––––

KEY, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification each of aggravated sexual contact and abusive sexual contact of Ms. SW, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The members sentenced Appellant to a dishonorable discharge, confinement for three years, and reduction to the grade of E-1. The convening authority deferred Appellant's reduction in grade until the date the entry of judgment was signed by the military judge and directed Appellant's automatic forfeitures be waived for a period of six months for the benefit of Appellant's dependents.

Appellant has raised 12 issues on appeal: (1) whether his convictions are factually and legally sufficient; (2) whether the military judge erred when he admitted the victim's interview with law enforcement into evidence as a prior consistent statement; (3) whether the military judge's failure to fully instruct the members on the definition of consent warrants relief;[3] (4) whether his trial defense counsel were ineffective; (5) whether trial counsel improperly commented on Appellant's right to remain silent; (6) whether the military judge erred in permitting trial counsel to ask a witness if he was aware Appellant's ex-wife had alleged Appellant sexually assaulted her; (7) whether he was subjected to illegal pretrial punishment; (8) whether his sentence is inappropriately severe; (9) whether the convening authority erred in failing to take action on Appellant's sentence; (10) whether the findings and sentence should be set aside under the cumulative error doctrine; (11) whether his conviction is invalid because he was not afforded the right to an unanimous verdict; and (12) whether the United States Supreme Court's ruling in *Solorio v. United States*, 483 U.S. 435 (1987), which held that personal jurisdiction over servicemembers does not depend on a service connection to the charged offense, should be "revisited and rejected."[4] We also consider the issue of timely post-trial processing

---

[1] All references in this opinion to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial*, *United States* (2016 ed.). All other references to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of sexual assault on divers occasions, in violation of Article 120, UCMJ, and one charge and one specification of assault consummated by a battery, in violation of Article 128, UCMJ, both involving Ms. SW.

[3] We also consider the related matter of the completeness of the record of trial with respect to this issue.

[4] Appellant personally asserts issues (11) and (12) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

and appellate review. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In April or May 2015, Appellant met Ms. SW on a dating website. At the time, Appellant was stationed in Alaska and Ms. SW lived in North Carolina, but Appellant anticipated receiving orders to Pope Army Airfield (AAF), North Carolina. In June 2015, Appellant went to North Carolina to visit his family who lived near the base. While he was there, he went on a few dates with Ms. SW. Shortly thereafter, Appellant received his military orders to Pope AAF, and he moved there in mid-August 2015. He and Ms. SW continued their relationship, and, about a month later, Ms. SW became pregnant with their son. She moved into Appellant's home in October 2015, and they married two years later in September 2017. In late May 2018, Ms. SW separated from Appellant and alleged he had sexually assaulted her on multiple occasions, including during her last evening in the house she shared with Appellant. The members convicted Appellant of two offenses arising out of his conduct during that last evening, but acquitted him of two specifications alleging prior assaults. At his court-martial, Appellant was represented by two civilian counsel in addition to his detailed military counsel.

## II. DISCUSSION

### A. Issues Summarily Resolved

#### 1. Alleged Pretrial Punishment: Issue (7)

The weekend prior to the start of Appellant's court-martial, Appellant's first sergeant directed Appellant to go to the Pope AAF emergency room in order to complete a confinement physical exam. Once he arrived at the emergency room, medical personnel there informed him such an exam would be premature at that point because Appellant had not been convicted of anything, let alone sentenced to confinement. On appeal, Appellant contends that the military judge abused his discretion in denying his motion for three days of credit based upon these events, which he argues amounted to illegal pretrial punishment under Article 13, UCMJ, 10 U.S.C. § 813. We have carefully considered this issue and find it does not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

#### 2. Convening Authority Not Taking Action: Issue (9)

In his Decision on Action memorandum, the convening authority indicated he took action on the sentence by deferring Appellant's grade reduction and waiving his automatic forfeitures. The convening authority did not, however,

specifically state what action he was taking with respect to Appellant's adjudged confinement or punitive discharge. After Appellant filed his assignments of error, the United States Court of Appeals for the Armed Forces (CAAF) decided *United States v. Brubaker-Escobar*, 81 M.J. 471, 472 (C.A.A.F. 2021) (per curiam). Consistent with that decision, we conclude the convening authority made a procedural error when he failed to take action on the entire sentence, considering that Appellant's offenses all occurred prior to 1 January 2019, and the charges were referred after that date. In spite of this error, we note the convening authority granted Appellant's requested deferment of the adjudged reduction in grade, and he lacked the ability to grant clemency with respect to the remainder of the adjudged sentence. In testing this error for material prejudice to a substantial right of Appellant, we conclude he is not entitled to relief. *See United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005).

### 3. Cumulative Error: Issue (10)

Appellant asserts the cumulative effect of errors pertaining to his court-martial deprived him of a fair trial and warrant setting aside the findings and sentence. As we discuss in this opinion, we find no error materially prejudicial to his substantial rights. Consequently, the cumulative error doctrine is inapplicable here.

### 4. Unanimous Verdict: Issue (11)

Appellant personally raises his claim that the Constitution guarantees the right to a unanimous verdict, a right not reflected in the current court-martial framework. Appellant raises this claim under *Ramos v. Louisiana*, __ U.S. __, 140 S. Ct. 1390 (2020), along with both the Fifth and Sixth Amendments. U.S. CONST. amend. V, VI. However, our superior court has held "there is no Sixth Amendment right to trial by jury in courts-martial." *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (citations omitted); *see also United States v. McClain*, 22 M.J. 124, 128 (C.M.A. 1986) (noting that "courts-martial have never been considered subject to the jury-trial demands of the Constitution"). The United States Supreme Court similarly concluded neither the Fifth Amendment nor the Sixth Amendment creates a right to a jury in a military trial in *Ex parte Quirin*, 317 U.S. 1, 45 (1942). *See also Ex parte Milligan*, 71 U.S. 2, 123 (1866); *Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) ("The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials

by courts-martial or military commissions. . . . The constitution of courts-martial . . . is a matter appropriate for congressional action.").[5] Moreover, Appellant cannot demonstrate he was convicted upon less than a unanimous vote by the members.[6] This issue warrants neither further discussion nor relief. *See Matias*, 25 M.J. at 361.

### 5. Absence of Service Connection to His Offenses: Issue (12)

Having considered Appellant's invitation, we decline to reject the binding precedent established by the United States Supreme Court more than three decades ago regarding the military's jurisdiction over servicemembers. We do not discuss this issue further. *See id.*

## B. Legal and Factual Sufficiency

Appellant contends his convictions are legally and factually insufficient, arguing that Ms. SW's testimony was uncorroborated and that she had both poor credibility and a motive to falsely accuse him of assaulting her. We are not persuaded.

### 1. Additional Background

At Appellant's court-martial in January 2020, Ms. SW testified that she "started losing interest" in sex with Appellant after their son was born, but Appellant meanwhile "started becoming more forceful [in] wanting to have sex." Ms. SW further testified that from September 2017 to May 2018, Appellant "would force [her] clothes off of [her] and force [her] into having sex with him against [her] will even though [she] had repeatedly told him no." She said this occurred multiple times a month until she decided to leave Appellant in May 2018. Ms. SW also said Appellant grabbed her neck with his hand without her consent once. For this conduct, Appellant was charged with sexually assaulting Ms. SW on divers occasions and committing a single act of assault consummated by a battery; he was, however, ultimately acquitted of these offenses.

Appellant's convictions for committing aggravated sexual contact and abusive sexual contact arose from events occurring in the evening of 23 May

---

[5] Although not argued by Appellant, our dissenting colleague suggests there may be a constitutional infirmity in the application of collateral post-trial consequences—such as sex-offender registration requirements—to people convicted by less-than-unanimous court-martial panels. Whether or not this is the case, our court has no authority to direct or constrain non-military entities' enforcement of generally applicable laws.

[6] During Appellant's court-martial, the Defense asked the military judge for "a polling of the panel," a request the military judge denied. Trial defense counsel did not explain what issues the proposed polling would have encompassed.

2018—the last evening Ms. SW intended to spend in the home. Ms. SW testified that while she was packing her belongings in their bedroom, Appellant was taking a shower in the adjoining bathroom, getting ready to report for his military night-shift duties. Appellant called her over and told her, "I would have treated you better if you had [ ] given it up to me every day." Without responding, Ms. SW walked away from the bathroom and resumed collecting her things.

As Ms. SW explained, Appellant then emerged from the bathroom with a towel around his waist. He dropped the towel and walked over to her, grabbed her left hand, and put her hand on his penis at which point she "jerked [her] hand away." Appellant then pushed her onto the bed and held her arms above her head. Ms. SW testified that she told Appellant "no" and tried to push him away, but he was "pinning [her] down to the bed" by laying on her right side, using his right hand to "push [her] left leg to the side," and "inch[ing] his body in between [her] legs."

Ms. SW said Appellant then started trying to pull down her shorts. The direct examination proceeded:

> Q: So before we get into that, so what were you wearing at the time?
>
> A: I remember I was wearing a T-shirt and I was wearing maternity shorts they were—had a stretchy band on top so he was able to pull them easily.
>
> Q: And so going back to what you are describing, he was trying to put his hand on your shorts?
>
> A: Yes. He hooked his fingers underneath my shorts and started moving his hands down towards my vagina.
>
> Q: Was he able to do that?
>
> A: He—yes. He got down pretty far. And before he, before he pulled down my shorts he was stroking my vagina outside of my shorts with his right hand.
>
> Q: And so just so we get the timeline clear, the touching that outside the shorts when did that occur?
>
> A: That happened after he was able to push my left leg to the side and he started touching me through the shorts.
>
> Q: What were you doing as he was touching you through the shorts?
>
> A: I was trying to get my arms free to push him away and then I tell him no.

Ms. SW testified Appellant was "using his fingers and rubbing up and down the outside of [her] shorts where [her] vagina is." Appellant was not able to penetrate Ms. SW's vagina, but she said that while "he got close to the outside of [her] vagina," he was unable "to go any further." Ms. SW said she "moved [her] knee up" to try and get Appellant's hand away as she "kept trying to get [her] arms free and trying to get him off of [her]" and that she thought she "even went so far as to trying to smack him [i]n between the legs." She also told Appellant he would be late for work if he did not stop, and Appellant eventually got up off her and went back to getting ready to go to work.

Appellant left a few minutes later, and Ms. SW finished packing. The next morning, Ms. SW left the house and moved in with her sister, Ms. JR. A couple of days later, Ms. SW told Ms. JR what had occurred, and Ms. JR suggested Ms. SW notify the police. Ms. SW agreed and filed a report with the Hoke County, North Carolina, Sheriff's Office on 26 May 2018. Ms. SW recounted the events of 23 May 2018 in an interview with a sheriff's deputy and one of the office's sergeants which was recorded on the deputy's body camera. Ms. JR was also present. In the interview, which was admitted into evidence in its entirety, Ms. SW told the deputy that as Appellant was getting ready for work, Appellant said that he and Ms. SW "should have sex again" before she left him. The following colloquy also took place in the interview:

> DEP [Deputy]: So as he was leaving for work the other day he— will—anyway or tell me before he left, he wants to have sex. You said he started pulling your shorts down?
>
> VIC [Ms. SW]: Yeah he pushed me down on the bed wouldn't let me up.
>
> DEP: Right.
>
> VIC: He tried pulling off my shorts and he tried to stick his hand on my shorts.
>
> DEP: Mm-hm.
>
> VIC: And I kept trying to push him away from—
>
> WIT [Ms. JR]: Didn't he make you touch him too?
>
> VIC: Yes. Yeah he grabbed my hand he made me touch him too. And he was naked at that time too.
>
> . . . .
>
> DEP: Did at any point during this incident, did he penetrate you?
>
> VIC: No.

DEP: Okay so he never—fingers, private part, anything like that, penis never went in?

VIC: I—fingers got close, but I think I was able to push him away before he could.

. . . .

SGT [Sergeant]: Did you—did he get your pants off?

VIC: No. I was able to keep him from doing that.

DEP: Never penetrated.

SGT: But did he touch you in your vaginal area?

VIC: Over my shorts.

SGT: Over your shorts.

VIC: Yeah.

SGT: And when his hand went in, he didn't touch anything?

VIC: He like was around the area but he didn't penetrate. I was able to like push his hands away before he was able to.

SGT: Okay. And then after you told him you pushed him away, did he stop?

VIC: No. I kept having to push him away. I even had to like—because he was naked at the time, I even had to like slap him like in between the legs to try and get him to go away. And he did not he was still being extremely aggressive towards me and the only thing that probably saved him or saved me from going further is that he was going to be late for work.

Two days later, Ms. JR noticed bruises on Ms. SW's legs and arms, and she pointed them out to Ms. SW. Ms. SW explained at Appellant's court-martial that she has a genetic disease rendering her legally blind, and she was unable to see the bruises herself—as a result, she was unaware of the bruises until Ms. JR told her about them. Ms. JR said at trial that the bruises appeared "as if someone grabbed like this and there were points," grabbing her left arm as she testified. Once Ms. SW learned she was bruised, she went back to the Hoke County Sheriff's Office, where a detective took pictures of her injuries, one of which was a bruise on the inside of Ms. SW's left knee. The photographs were admitted into evidence as a prosecution exhibit.

During Ms. SW's cross-examination, trial defense counsel did not specifically ask Ms. SW about the 23 May 2018 incident. Instead, the Defense sought to establish that, contrary to Ms. SW's testimony, Appellant and Ms. SW had

engaged in consensual sexual conduct throughout their relationship, and on some occasions Ms. SW would initially rebuff Appellant's advances but then later consent to sexual activity. The Defense also attempted to show that Ms. SW was frustrated with Appellant not helping around the house and that she stood to gain financially should Appellant be convicted. Ms. SW conceded that while she was living with Appellant, she had never told anyone he was sexually assaulting her, but she explained Appellant would "always tell [her] that it's not rape when you're married."

Through their cross-examination of law enforcement witnesses, the Defense sought to establish that Ms. SW had made inconsistent or unbelievable claims about how often Appellant sexually assaulted her during their relationship. In the Defense's closing argument, trial defense counsel specifically pointed to the fact Ms. SW discussed only the 23 May 2018 incident when she was interviewed by the Hoke County investigators and that her other allegations did not surface until some later point in the investigation.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (internal quotation marks and citation omitted). The "[G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In

9

conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order for Appellant to be found guilty of aggravated sexual contact, as charged here, the Government was required to prove beyond a reasonable doubt: (1) that Appellant committed sexual contact upon Ms. SW by touching her groin with his hand; (2) that he did so by using unlawful force; and (3) that he did so with the intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.b.(5)(a). "Sexual contact" includes, *inter alia*, "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *Id.* ¶ 45.a.(g)(2)(B). "Unlawful force" means "an act of force done without legal justification or excuse." *Id.* ¶ 45.a.(g)(6). "Force" includes "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person." *Id.* ¶ 45.a.(g)(5)(B).

In order for Appellant to be found guilty of abusive sexual contact, the Government was required to prove beyond a reasonable doubt: (1) that Appellant committed sexual contact upon Ms. SW by using his hand to place her hand on his penis; (2) that he did so by causing bodily harm to Ms. SW, to wit: placing her hand on his penis; (3) that he did so with the intent to gratify his sexual desire; and (4) that he did so without Ms. SW's consent. *Id.* ¶ 45.b.(7)(b).[7] "Bodily harm" includes "any nonconsensual sexual act or nonconsensual sexual contact." *Id.* ¶ 45.a.(g)(3). "Consent" means "a freely given agreement to the conduct at issue by a competent person." *Id.* ¶ 45.a.(g)(8)(A).

The affirmative defense of mistake of fact as to consent is available to an accused who can demonstrate that he or she—through ignorance or mistake—incorrectly believed another consented to the sexual contact in question. *See* Rule for Courts-Martial (R.C.M.) 916(j)(1). In order to rely on this defense, the accused's belief must be both honest and reasonable. *See id.*; *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)); *United States v. Gans*, No. ACM 39321, 2019 CCA LEXIS 162, at *14 (A.F. Ct. Crim. App. 11 Apr. 2019) (unpub. op.). Once raised, the Government bears the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78

---

[7] Although the *Manual for Courts-Martial* does not include the element of "without consent," the military judge instructed the members that they were required to find this element had been met.

M.J. 376, 379 (C.A.A.F. 2019). "The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *McDonald*, 78 M.J. at 381.

**3. Analysis**

On appeal, Appellant attempts to undermine the evidence supporting his convictions, largely relying on his claim that Ms. SW was not a credible witness. He argues that she had a financial motive to fabricate her claims and that her testimony was inadequately corroborated. After reviewing the record, however, we conclude Appellant's post-trial attack has missed its mark.

While trial defense counsel raised some questions about Ms. SW's testimony during the court-martial, the Defense was unable to decisively impair her credibility. The primary shortcoming of Ms. SW's testimony was its lack of detailed specifics about the various assaults she alleged she suffered over the course of her relationship with Appellant. Ms. SW, however, did provide specific details about the events of 23 May 2018. Moreover, she reported those events almost immediately after they occurred and gave recorded interviews to law enforcement the same week. The Government also obtained photographic evidence of Ms. SW's bruises taken around the same time. True, there were some minor inconsistencies between Ms. SW's testimony and her interviews which took place two years earlier, but the Defense spent little time trying to highlight those inconsistencies. Instead, trial defense counsel mounted a broader attack by portraying Ms. SW as typically refusing Appellant's sexual entreaties at first but later consenting to sexual activity. Considering Appellant was acquitted of the more serious sexual assault specification along with the assault consummated by a battery charge, the Defense's approach was not altogether unsuccessful.

That being said, the Defense's claim that Ms. SW—as a matter of course—would first rebuff Appellant's advances only to later acquiesce was thinly sourced. In fact, the claim seems to have been derived from a single question posed by trial defense counsel: "[I]sn't it true that there were some—there were many times when [Appellant] asked you to have sex and you may have not been in the mood, but you gave in, you gave [in] and you consented?" Ms. SW answered, "There were sometimes, yes." After that exchange, trial defense counsel moved on to other matters. Whatever may be gleaned from this response by Ms. SW, a rational factfinder could wholly reject the notion that on 23 May 2018—while Appellant was pinning her down and holding her arms above her head, while she was telling him "no" and struggling to get away from him after Appellant had said he would have been nicer to her if she had "given it up" every day, all against the backdrop of her packing to leave the house and their marriage—Ms. SW was, in fact, consenting despite all her outward manifestations to the contrary. Similarly, a rational factfinder could conclude the

Government had proven beyond a reasonable doubt that Ms. SW did not consent to Appellant's actions that evening and that Appellant was operating under neither an honest nor a reasonable belief that she did.

The Defense sought to portray Ms. SW as having a financial incentive to allege Appellant had abused her, namely so that she could receive transitional compensation. The force of this accusation was largely blunted when Ms. SW disavowed any knowledge of the program. While trial defense argued "[i]t's not credible that she didn't know" because she was assigned a special victims' counsel whose "job is to make sure that the person knows what's going on with the process, with the court-martial, with everything they can get that might happen to them after this court-martial," no evidence was ever adduced as to how much compensation Ms. SW might receive, when she would first receive it, how long it would last, or if she was even entitled to it at all. Moreover, there is nothing in the record indicating when Ms. SW retained her special victims' counsel's services, much less evidence that she had spoken to a special victims' counsel prior to 26 May 2018, when she first reported Appellant's conduct to the Hoke County Sheriff's Office. Thus, a rational factfinder could place little or no significance on the fact that a transitional compensation program exists or that Ms. SW could conceptually benefit from it in some indeterminate fashion. In the face of Ms. SW's stated lack of knowledge of the program, a rational factfinder could reject the theory outright.

The aggravated sexual contact specification alleges Appellant committed the offense by "touching [Ms. SW's] groin with his hand, with an intent to gratify his sexual desire, by using unlawful force." The dissent takes issue with the factual sufficiency of that specification insofar as Ms. SW did not specifically state Appellant touched her "groin," as he was charged with doing. Although not raised either at trial or by Appellant on appeal, the dissent seeks to limit the anatomical boundaries of Ms. SW's groin to the point that it lies outside the reach of the evidence in this case.

At no point did Ms. SW use the word "groin" in her testimony. Instead, Ms. SW testified that Appellant "hooked his fingers underneath [her] shorts and started moving his hands down towards [her] vagina," and in doing so, "[h]e got down pretty far" and "close to the outside of [her] vagina." She said in her interview with the sheriff's deputy that when Appellant's hand was in her shorts, he did not penetrate her vagina, but "[h]e like was around the area." In addition, he touched her vaginal area through her shorts with his fingers, "rubbing up and down the outside of [her] shorts where [her] vagina is."

Two of our sister service courts have relatively recently sought to distinguish a person's genitals from their groin, giving some traction to the dissent's argument. In *United States v. McDonald*, the United States Navy-Marine

Corps Court of Criminal Appeals determined two specifications were not facially duplicative where one involved the appellant touching the victim with his penis while the second alleged the appellant had rubbed his groin on the victim's buttocks. 78 M.J. 669, 680 (N.M. Ct. Crim. App. 2018). The court reasoned that "groin" and "penis" are not synonymous, because a medical dictionary reviewed by the court defined "groin" as "[t]he groove, and the part of the body around it, formed by the junction of the thigh with the abdomen, on either side,"[8] and because "groin" and "genitalia" are listed separately in the definition of "sexual contact" in Article 120, UCMJ.[9] *Id.* The court further highlighted that the two specifications covered different acts committed on different days and concluded the appellant's argument lacked merit. *Id.*

In *United States v. Perez*, the United States Army Court of Criminal Appeals concluded that the trial judge had failed to elicit a sufficient factual basis to support the appellant's guilty plea, where the appellant was charged with touching the victim's genitals but explained in his providence inquiry that he had touched the victim on her pubic mound, just above her genitals. ARMY 20140117, 2016 CCA LEXIS 131, at *6 (A. Ct. Crim. App. 29 Feb. 2016) (unpub. op.). The court concluded that substituting "groin" for the charged "genitals" during appellate review would amount to a material and possibly fatal variance under the theory that "'genitals' is not the same as 'groin' or 'groin area.'" *Id.* at *5–6.

However, other than contemplating the difference between a person's groin and their genitals, these two cases bear little similarity to Appellant's. *McDonald* involved a multiplicity challenge in which the court concluded the Government's charging scheme adequately put the appellant on notice of what he was required to defend against and differentiated between the charged events so that appellant was not being convicted of the same conduct twice. *Perez*, on the other hand, covered the familiar prohibition of modifying a charge such that the appellant was denied the ability to prepare for trial and defend against the charge. *See United States v. Treat*, 73 M.J. 331, 336 (C.A.A.F. 2014).

In the instant case, Appellant was charged with touching Ms. SW's groin. At trial, Ms. SW testified that Appellant reached "pretty far" down her shorts and his hand was near, but not touching, her vagina. This, in conjunction with

---

[8] The court cited J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER (Release No. 52 Sep. 2018).

[9] *See* Article 120(g)(2)(A), UCMJ, 10 U.S.C. § 920(g)(2)(A), defining sexual contact as "touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person . . . ."

her testimony about Appellant using his fingers to rub "up and down the outside of [her] shorts where [her] vagina is," leaves little doubt Appellant touched Ms. SW's groin, even using the definition of "groin" employed in *McDonald*. That is, Appellant touched Ms. SW either where her thighs joined her abdomen, or *the part of the body around* that junction.[10] Thus, even adopting a rigid distinction between Ms. SW's groin and Ms. SW's genitals, the evidence still supports the conclusion that Appellant touched her groin.

We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offenses, to include that he touched Ms. SW's groin. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## C. Admission of the Recording of Ms. SW's Interview

As discussed above, the recording of Ms. SW's interview at the Hoke County Sheriff's Office was admitted into evidence at Appellant's trial. Appellant argues that this was improper under the theory that the recording did not qualify

---

[10] We also note that "groin" is often used to generally describe the area between a person's legs, to include their genitals. *See, e.g.*, *United States v. Gould*, ARMY 20120727, 2017 CCA LEXIS 338, at \*11 (A. Ct. Crim. App. 17 May 2017) (unpub. op.) (equating "genital area" to "groin"); *United States v. Washington*, 61 M.J. 574, 577 (N.M. Ct. Crim. App. 2005) (describing "private part" as "the groin area of the male and female anatomy"); *United States v. Hanson*, 30 M.J. 1198, 1200 (A.F.C.M.R. 1990) (stating appellant made a comment about his genitals and then grabbed himself "in the groin area"). Similarly, appellate opinions make repeated references to people being kicked in the groin, which seem far more likely to refer to a person being kicked in the genitals as opposed to the precise area where their abdomen meets their thigh. *See, e.g.*, *United States v. Powell*, 49 M.J. 220, 223 (C.A.A.F. 1998); *United States v. Hughes*, 48 M.J. 700, 708 (A.F. Ct. Crim. App. 1998); *United States v. Viola*, 26 M.J. 822, 825 (A.C.M.R. 1988). References to groin as the area above a person's genitals are also not uncommon. *See, e.g.*, *United States v. Rodriguez*, 31 M.J. 150, 152 (C.M.A. 1990) (stating appellant put his hands in the victim's pants "into her groin area, on her pubic hair"); *Stratton v. State*, 132 So. 3d 1074, 1077 (Miss. Ct. App. 2014) (describing a scar "directly above the pubic area of [the defendant's] groin"); *People v. Flock*, 2008 Mich. App. LEXIS 2388, at \*15–16 (Mich. Ct. App. 25 Nov. 2008) (unpub. op.) (concluding area covered by pubic hair is part of the groin); *People v. Sykes*, 793 N.E.2d 816, 826 (Ill. App. Ct. 2003) (alternatively describing defendant having shaved his "pubic area" and his "groin"). Moreover, in *Perez*, the military judge and the parties referred to the appellant touching the victim's groin area while describing that area as a spot above her genitals, where her pubic hair would be. 2016 CCA LEXIS 131, at \*3.

as a prior consistent statement under the Military Rules of Evidence. We find, however, that Appellant has waived this issue.

### 1. Additional Background

The parties gave their opening statements the morning of 14 January 2020, and the Government next called Ms. SW to testify. At the conclusion of her testimony, the court-martial recessed for lunch, and Ms. JR testified for the Government once the court reconvened. After Ms. JR was excused, trial counsel asked the military judge, "Your Honor, based on discussions over the lunch break, maybe [sic] have a 10 minute recess to prepare documentary piece of evidence to present?" The military judge granted the request, and the court reconvened at the end of the recess. Prior to calling the members into the courtroom, the military judged asked if there was "anything we need to take up regarding this document." The following colloquy occurred:

> CTC [circuit trial counsel]: "No, Your Honor[. F]or the [c]ourt's awareness we were going to put in snippets of her Hoke County—the [victim's] Hoke County interview as prior consistent statements however discussing with the [D]efense, under rule of completeness they would like the entire interview to come in. And so we agreed to that so we're going to put the entire interview in through [the sheriff's deputy].
>
> MJ [military judge]: Okay, all right. Is that your understanding [D]efense?
>
> CivDC2 [second civilian defense counsel]: It is sir, it is sir.
>
> MJ: Okay. I'll take that proffer. All right. Call the members.

Once the members returned to the courtroom, the sheriff's deputy was called to the stand, and trial counsel sought to admit the recording of Ms. SW's interview as Prosecution Exhibit 1 early in his testimony. Trial defense counsel objected and asked to "question the witness on the foundation." The military judge responded, "All right let's—you're saying there's lack—so you are objecting for lack of foundation?" One of Appellant's trial defense counsel responded, "I'm also, yes. . . . I'm also worried about that's a complete body cam from the entire day." The military judge then said he would permit the Government to "follow up" on the matter, which led to trial counsel eliciting testimony from the sheriff's deputy to the effect that the proffered recording was the entirety of Ms. SW's interview.

The military judge asked the Defense again whether they had any objection, and trial defense counsel argued "there should be more body cam footage. I want to make sure there's not additional footage and what happened." Trial defense counsel said he reviewed the video and then posited, "I know that a 20

minute, a 20 minute video that starts with 08, and then the next one starts at 31, and they come together, there's three minutes missing. I'm trying to figure out where those three minutes are."[11] Without any further discussion, the military judge overruled the defense objection and admitted the recording as Prosecution Exhibit 1.

During the Defense's closing argument, trial defense counsel invoked the recording to demonstrate that Ms. SW only told the sheriff's deputy about the events of 23 May 2018 and made no allegations during the interview of having suffered prior and repeated sexual assaults during her relationship with Appellant. Trial defense counsel argued Ms. SW's version of events had morphed over time, telling the members, "This is a story that started as, 'Well, my husband was mean to me on 23 May,' and evolved into a whole different story."

**2. Law**

A declarant-witness's prior, out-of-court statement which is consistent with his or her trial testimony is admissible under two circumstances: (1) when the statement is offered to rebut a charge that the declarant recently fabricated the trial testimony or gave the testimony due to a recent improper influence or motive, or (2) when the statement is offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Mil. R. Evid. 801(d)(1)(B). Prior consistent statements under this rule need not be identical to trial testimony, but must only be "'for the most part consistent' and in particular, be 'consistent with respect to . . . fact[s] of central importance to the trial.'" *United States v. Finch*, 79 M.J. 389, 395 (C.A.A.F. 2020) (alterations in original) (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)). When offered to rehabilitate the declarant's credibility, such statements must "be relevant to rehabilitate the witness's credibility on the basis on which he or she was attacked." *Id.* at 396. Statements admitted under this rule are not hearsay and therefore amount to substantive evidence. *Id.* at 395.

When an appellant does not preserve error with respect to the admission of evidence by lodging a timely objection, that error is forfeited unless it amounts to plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)) (additional citations omitted). Waiver, however, occurs when an appellant has intentionally relinquished or abandoned a known right. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). When an appellant affirmatively states he has no objection to

---

[11] The sheriff's deputy testified the interview recording consisted of three video files. We are unable to precisely discern from the record what trial defense counsel's references to "08" and "31" pertain to, but we presume he is referring to time markers on the videos.

the admission of evidence, the issue is ordinarily waived and his right to complain about its admission on appeal is extinguished. *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)).

### 3. Analysis

Appellant argues on appeal that the military judge erred by admitting the recorded interview as a prior consistent statement for a variety of reasons, not the least of which is that the recording contains both statements by people other than Ms. SW and statements by Ms. SW which were not actually consistent with anything she testified to. Appellant further argues we should review the admission of the recording under a plain error standard. We disagree, as we conclude Appellant intentionally abandoned his right to object to the admissibility of the recording and therefore waived the issue on appeal.

Trial counsel explained to the military judge that the parties had actually negotiated what portions of the recording would be admitted into evidence—as opposed to whether the recording would be admitted at all. The Government only intended to offer portions of the recording, but trial defense counsel desired the *entire* recording to be admitted, and trial counsel agreed to do so. The military judge squarely asked trial defense counsel if the Government's explanation mirrored trial defense's counsel's understanding, and they said it did. When the Government sought to admit the recording during the sheriff's deputy's testimony, the Defense objected, but that objection pertained to their concern that the members were going to receive something less than the entire interview, not that the interview—or any portion of it—should *not* be admitted. Appellant's position at trial was that the entire recording should be admitted into evidence, and that position operates to waive the alleged error on appeal.[12]

Pursuant to Article 66(d), UCMJ, we have the unique statutory responsibility to affirm only such findings of guilty and so much of the sentence that is correct and "should be approved." 10 U.S.C. § 866(d). Thus, we retain the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). We recognize that had the Defense objected to the recording at trial on the grounds Appellant now seeks to advance, a proper application of the rules of evidence would have almost assuredly resulted in something less

---

[12] Appellant argues his defense counsel were ineffective by permitting the introduction of the recording; we address that contention within our analysis of Appellant's other ineffective-assistance claims, *infra*. To the extent there was any question whether trial defense counsel actually sought admission of the entire interview, the declarations submitted in response to Appellant's ineffective assistance of counsel claims make clear the Defense made the strategic choice to seek to the interview's admission.

than the entire recording being admitted. Beyond simply not objecting to the recording, Appellant's counsel affirmatively agreed to its admission. Appellant has not identified any authority that prohibits parties from agreeing to admit evidence which may be otherwise subject to objection under the rules of evidence. Instead, Appellant seems to have come to the conclusion—post-trial—that such an agreement was not the best strategy. Considering the foregoing, we decline to pierce Appellant's waiver, and we will leave it intact.

### D. Military Judge's Failure to Instruct on the Definition of Consent

The military judge's findings instructions—which both the Government and the Defense expressly agreed to at trial—did not define the term "consent." On appeal, Appellant submits that this error warrants setting aside the findings and sentence in his case. The Government, meanwhile, argues Appellant affirmatively waived the issue.[13]

#### 1. Additional Background

Following the close of evidence, the military judge released the members for the day and conducted an R.C.M. 802 conference regarding the findings instructions, and afterwards, he sent the parties a draft of his instructions. The next morning, the military judge discussed the instructions with the parties on the record. At one point in this discussion, the military judge asked if the parties saw any defenses raised in the case. Trial counsel said, "No," but trial defense counsel said, "Other than the reasonable mistake of fact, which you've already included in your instructions, sir."

At the end of this discussion, the military judge asked if there were any objections to the instructions. Trial defense counsel answered, "There are not, sir." The military judge then asked, "[D]o both trial counsel and defense counsel specifically affirm that the instructions are a correct statement of law, to the best of your knowledge and understanding?" Both trial counsel and trial defense counsel responded affirmatively. The military judge then recessed the court-martial for nearly half an hour so that he could finalize the instructions.

When the court reconvened, the military judge again asked if the parties had any objections to the instructions or requests for additional instructions. One of Appellant's trial defense counsel first said the Defense had not been able to review the revised instructions due to lack of Internet access in the courtroom. A second trial defense counsel said he was aware of what was being changed in the instructions and that the Defense had no objection "to that change." That same trial defense counsel then noted the military judge had

---

[13] To the extent the issue was waived, Appellant argues such waiver constitutes ineffective assistance of counsel. We address that claim later in this opinion's ineffective-assistance section.

made a comment about "adding a separate part of one of the elements," leading the military judge to say: "Right. Right. We had add—that was missing from the part—the second element. No objections. Defense, do you want additional time? I'll certainly give it to you."[14] One trial defense counsel replied, "No, sir," and a second said, "No, we're fine, if those were the two changes. I understand."

After the military judge read the instructions to the members and the parties gave their closing arguments, the military judge again asked if the parties objected to the instructions or requested additional instructions. Both trial counsel and trial defense counsel answered in the negative.

Three weeks after Appellant was sentenced, the military judge notified the parties via email that his findings instructions had not included a definition of the word "consent," which was an element of the offense of abusive sexual contact alleged in Specification 2 of Charge I.[15] In his email, the military judge noted the Defense had not requested this definition be included and that the Defense had not argued a theory of consent to the members,[16] but he directed the parties to submit briefs addressing whether the lack of a definition constituted error and, if so, what relief was warranted.

The instructions the military judge had read to the members included the elements of all the charged offenses. For the aggravated sexual contact specification, those elements essentially amounted to: sexual contact; unlawful force; and specific intent. For abusive sexual contact, the elements included: sexual contact; bodily harm; specific intent; and lack of consent.

The military judge also instructed the members that the defense of mistake of fact applied to all the charged offenses in the case. In giving that instruction, he said, "There has been testimony tending to show that, at the time of the alleged offenses, the accused mistakenly believed that [Ms. SW] consulted [sic] to the sexual or physical conduct alleged concerning these offenses."[17] He told the members that the defense was available if they concluded Appellant "held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual or physical conduct." The military judge further ex-

---

[14] This discussion had been about whether to include "without consent" in the second element of the abusive sexual contact specification in light of the fact "without consent" was already listed as a fourth element to that offense.

[15] Lack of consent was also an element of the sexual assault specification, of which Appellant was acquitted.

[16] The military judge was incorrect on this point—the Defense's primary argument at trial was that all sexual contact between Appellant and Ms. SW was consensual.

[17] The words "consulted [sic]" appear in the transcript.

plained that a mistake would only be reasonable if it was "based on information, or lack of it, that would indicate to a reasonable person that the other person consented to the sexual or physical conduct." Finally, he instructed the members that the Government had the burden to prove beyond a reasonable doubt that the defense did not exist. In addition to this defense, the military judge told the members they could consider Ms. SW's past sexual and physical contact with Appellant on the question of whether she consented to the charged acts.

The instruction on consent found in the *Military Judges' Benchbook*, which the military judge did *not* give, explains that, "[a]ll the evidence concerning consent to the sexual conduct is relevant and must be considered" in assessing whether the Government has met its burden. Dept. of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 3-45-15 (10 Sep. 2014) (*Benchbook*). The instruction also explains that evidence an alleged victim did consent may lead the members to have a reasonable doubt as to whether the Government has proven the offense. Following that instruction, the *Benchbook* proposes a definition of consent—also omitted by the military judge—as "a freely given agreement to the conduct at issue by a competent person," that "[a]n expression of lack of consent through words or conduct means there is no consent," that "[l]ack of consent may be inferred based on the circumstances," and that "[a]ll the surrounding circumstances are to be considered in determining whether a person gave consent."

In a written response to the military judge's email, the Defense argued the military judge had made an error of constitutional dimension and a mistrial was warranted. Contrary to the statement in the military judge's email, trial defense counsel asserted one of the defenses they pressed at trial was that Ms. SW had consented to all the charged conduct. The Government, meanwhile, argued the Defense had waived the issue and that even if the issue had not been waived, Appellant was not prejudiced by the definition's omission.

The military judge convened a post-trial hearing regarding the instruction on 11 May 2020.[18] At the hearing, trial counsel reiterated their position that Appellant had waived the matter by virtue of announcing they had no objections to the instructions. Trial counsel also argued that even if the military judge had erred, Appellant was not prejudiced, because the *Benchbook* definition of consent would have favored the Government more than Appellant. The Defense argued that consent was a defense to the abusive sexual contact offense, so the definition of consent was a required instruction. The Defense also argued that even though consent is not a defense to aggravated sexual contact,

---

[18] The hearing had been scheduled earlier, but was delayed due to logistical challenges arising from the Coronavirus (COVID-19) pandemic.

consent could "negate" the element of force. Trial defense counsel conceded Appellant would not be entitled to relief for waived error, but argued that in order for Appellant to have waived the issue, "there would've had to have been a dialogue" in which the military judge explicitly asked if Appellant wished to waive particular instructions. Trial defense counsel said the omission of the definition amounted to plain error and Appellant was prejudiced in that the members were not told they must consider all the surrounding circumstances in determining whether Ms. SW had consented or not. Because a key aspect of the overall defense theory was that Ms. SW would typically resist Appellant's sexual advances but eventually consent to them, the Defense asserted the members needed the instruction in order to understand that the legal concept of consent "is broader than a merely yes or no." Trial defense counsel maintained they simply failed to notice the absence of the consent instruction at trial, as discussed in more detail in Section II(F)(2)(a), *infra*.

In late May 2020, the military judge issued a ruling on the matter of his instructions, but the ruling is missing from the record of trial docketed with this court, as discussed in greater detail in Section II(I), *infra*. In their pleadings before this court, the parties agree the military judge declined to grant Appellant's request for a mistrial or any other relief.

**2. Law**

Military judges are required to "determine and deliver appropriate instructions." *United States v. Barnett*, 71 M.J. 248, 249 (C.A.A.F. 2012) (quoting *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008)). Required instructions include a "description of the elements of each offense charged," any applicable special defenses, and "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, *sua sponte*, should be given." R.C.M. 920(e).

"Failure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the objection." R.C.M. 920(f); *see also United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (reviewing failure to object to instructions for plain error). The CAAF has concluded a valid waiver at trial "leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197 (citing *Campos*, 67 M.J. at 332). Where an appellant "affirmatively decline[s] to object to the military judge's instructions and offer[s] no additional instructions," he may thereby affirmatively waive any right to raise the issue on appeal, even "in regards to the elements of the offense." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020). Instructions that would be otherwise required may be waived, such as instructions on affirmative defenses. *See, e.g.*, *United States v. Rich*, 79 M.J. 472, 477 (C.A.A.F. 2020); *United States v. Gutierrez*, 64 M.J. 374, 377–78 (C.A.A.F. 2007). "Whether an appellant has waived an issue is a legal

question that this [c]ourt reviews de novo." *Davis*, 79 M.J. at 331 (citing *United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019)).

### 3. Analysis

By stating on the record that the Defense had no objection, Appellant affirmatively waived any objection to the military judge's instructions. Trial defense counsel said they had no objection to the instructions both before and after they were given to the members. The Defense had these instructions in writing and listened to the military judge read them in open court. Under *Davis*, the only conclusion available is that Appellant waived the issue of the definition of consent. 79 M.J. at 331.

However, the CAAF has made clear that the Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or to pierce that waiver in order to correct a legal error. *See Hardy*, 77 M.J. at 442–43; *United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016) (discussing our ability to correct error despite waiver).

Although the omission of the consent instruction was apparently due to the military judge's oversight—and the absence of a defense objection was the product of a similar oversight on trial defense counsel's part—Appellant had ample opportunity to review and object to the instructions. Appellant's post-trial argument that the military judge did not strictly follow the proposed *Benchbook* language does not warrant our intervention, especially when we consider the fact that "the *Benchbook* is not binding as it is not a primary source of law." *United States v. Riley*, 72 M.J. 115, 122 (C.A.A.F. 2013). Even if we were to pierce Appellant's waiver, we conclude Appellant was not prejudiced by the instructions that were given, as discussed in Section II(F)(2)(a), *infra*. Therefore, we will leave Appellant's waiver intact.

### E. Testing the Basis of Character Testimony

Appellant argues the military judge erred in permitting the Government to ask a defense character witness about allegations Appellant had sexually assaulted his previous wife. We disagree.

### 1. Additional Background

In pre-sentencing proceedings, the Defense called Mr. BB, a friend of Appellant's. During Mr. BB's brief testimony, he explained that he befriended Appellant when the two of them were sophomores in high school and that they had kept in touch over the years, including through Appellant's court-martial—a period of approximately 15 years. Trial defense counsel asked Mr. BB to describe Appellant, and Mr. BB spoke approvingly of Appellant as a father and a friend. In the midst of his narrative response, Mr. BB said,

> [Appellant] has been there for me when I had family emergencies and issues, and the same way around. [Appellant] would never turn your [sic] back on anybody, [Appellant] wouldn't hurt anybody. It's not in his DNA to hurt anybody. And I can tell you that from high school to everything else, [Appellant] would never do anything wrong to you. He would actually help you if he could and he would do whatever he can.

Mr. BB's direct examination concluded shortly thereafter and trial counsel requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. In that hearing, trial counsel argued that by saying Appellant "wouldn't hurt anyone," Mr. BB had opened the door to allow the Government to ask him if he was aware Appellant's ex-wife had also accused Appellant of sexual assault.[19] The Defense objected to the question and argued the military judge should determine what Mr. BB's answer would be while outside the members' presence, because trial defense counsel believed Mr. BB had no knowledge of the allegation. The military judge said he would permit the question, specifically noting he concluded the question's probative value was not outweighed by the danger of unfair prejudice in light of the fact he was only permitting trial counsel to ask the one question. He explained the question was permissible to test Mr. BB's opinion, and he further ruled the question would be asked for the first time in front of the members. When the members returned to the courtroom and Mr. BB was asked if he was aware of the allegation, he said he was not.

After two more defense witnesses and Appellant's unsworn statement, the Defense rested and the members were excused. At some point, one of the panel members submitted this written question to the military judge: "Is it possible for the panel to learn more of the allegations [Appellant's] ex-wife made against him, specifically the nature of the claims in [sic] any findings related to them." This led trial defense counsel to move for a mistrial, arguing trial counsel did not have a good faith basis for asking the question in the first place and that they were simply trying to "poison the well" by putting the allegation in front of the members. The military judge denied the motion, reiterating his view that the question was, in fact, proper because "the [D]efense opened the door." The military judge read a proposed instruction to the parties, to which trial defense counsel said, "We don't want that instruction." The military judge responded, "You just asked for mistrial, I'm giving the instruction." When the members returned, the military judge instructed them:

---

[19] Trial counsel had provided pretrial notice to the Defense of their intent to raise the alleged sexual assault in rebuttal. Trial counsel also explained to the military judge the factual basis for the allegation.

> During the testimony of [Mr. BB], he was asked whether he was aware that [Appellant] was alleged to have assaulted his ex-wife. This was a permissible question, however there is no evidence that [Appellant] assaulted his ex-wife. This question was permitted to test the basis of the witness's opinion, and to enable you to assess the weight you accord to his testimony. You may not consider the question for any other purpose.

The military judge asked the members if they could follow this instruction, and he noted he received an affirmative response from each of them.

**2. Law**

Cross-examination concerning prior misconduct, "if there is a good-faith belief for the question, is the means of testing a witness'[s] testimony concerning an accused's character." *United States v. Pruitt*, 46 M.J. 148, 151 (C.A.A.F. 1997) (footnote omitted); *see also* Mil. R. Evid. 405(a). One purpose of such an inquiry is "to raise questions about the witness'[s] standard of evaluating good character." *Pruitt*, 46 M.J. at 151. However, "the cross-examiner is not allowed to prove the existence of the acts about which he asks." *United States v. Martinez*, No. ACM S31909, 2012 CCA LEXIS 324, at *7 (A.F. Ct. Crim. App. 23 Aug. 2012) (unpub. op) (quoting Stephen A. Saltzburg, et al., Military Rules of Evidence Manual 496 (3d ed. 1991)). Thus, the suggestion of prior misconduct in so-called "have you heard" or "did you know" questions is not offered to prove the misconduct occurred, but rather to evaluate the witness's opinion. *United States v. Beno*, 324 F.2d 582, 588 (2d Cir. 1963), *cited with approval in United States v. Trimper*, 28 M.J. 460, 467 (C.M.A. 1989); *United States v. Anderson*, No. ACM 39141, 2018 CCA LEXIS 122, at *5 (A.F. Ct. Crim. App. 28 Feb. 2018) (unpub. op.) (explaining that counsel may, on a good-faith basis, ask such questions to test the basis for and attempt to undermine the witness's opinion).

Such "have you heard" questions must still pass muster under Mil. R. Evid. 403 before they are asked. *United States v. Pearce*, 27 M.J. 121, 125 (C.M.A. 1988). This imposes the "heavy responsibility" on the military judge to "protect the practice from any misuse." *Id.* (quoting *Michelson v. United States*, 335 U.S. 469, 480 (1948)). Military judges are afforded broad discretion in applying Mil. R. Evid. 403, but we give less deference to military judges "if they fail to articulate their balancing analysis on the record." *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

**3. Analysis**

We conclude the military judge did not abuse his discretion in permitting the Government to test the foundation of Mr. BB's opinions by asking him if

he was aware of the prior assault allegation. Mr. BB had testified to Appellant's positive character attributes and declared Appellant would not hurt anyone, based upon their decade-and-a-half-long friendship. This left the impression that Appellant was a kind and nonviolent person and had been so the entire time they had been friends. The fact Mr. BB was not aware of the allegation tends, in some slight fashion, to undermine the basis for his opinion about Appellant's character. This is so because it demonstrated Mr. BB's exposure to Appellant was arguably limited and therefore his opinion was entitled to less weight. *See, e.g.*, *Pearce*, 27 M.J. at 125 (finding no error in asking a witness if he was aware the appellant had been under investigation several years prior to his court-martial for a similar offense, in part because the witness's lack of knowledge of the investigation undercut the basis for the witness's opinion about the appellant's honesty).

The military judge's analysis of this issue is wanting, however. While he said he found the probative value of the question to not be substantially outweighed by unfair prejudice, he did not say how he came to the conclusion or what factors he considered, other than that he was going to limit trial counsel to asking just one question. As a result of his failure to articulate his analysis, we grant the military judge's ruling less deference than we otherwise would have given it.

Under Mil. R. Evid. 403, evidence may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice." In the case of Appellant standing trial for sexually assaulting his wife, the deeply prejudicial value of suggesting to the members he also sexually assaulted his ex-wife would not seem up for debate. Indeed, trial counsel's singular question on the matter almost immediately led a member to ask for more information about the allegation.

In one sense, the probative value of the question was low, considering Mr. BB had no knowledge of the allegation—which meant the members were not permitted to consider the truth of the allegation.[20] Trial counsel did not seek to ask Mr. BB if such an allegation would change his opinion, nor did trial counsel comment on Mr. BB's testimony at all in the Government's sentencing argument. This definitely raises the specter that this question was put to Mr. BB not so much for the purpose of testing the basis of his opinion, but to instead

---

[20] We also note that trial counsel asked if Mr. BB was aware Appellant had been *accused* of sexually assaulting his ex-wife as opposed to asking about Appellant's actual conduct. The CAAF has held this is "an error of form, not substance." *United States v. Pearce*, 27 M.J. 121, 124 (C.M.A. 1988).

communicate uncharged misconduct to the members.[21] On the other hand, it was the Defense that called Mr. BB, who testified about his long-standing friendship with Appellant and his belief that Appellant would not hurt anybody and "would never do anything wrong to you." These attributes squarely relate to Appellant's rehabilitative potential and the question of whether society needed to be protected from Appellant with a lengthy term of confinement. The fact Mr. BB was unaware of such a serious allegation demonstrates his relationship with Appellant was not as close as he portrayed it, which, in turn, undermined the basis of his opinion. After trying to portray himself as not being capable of harming anyone, Appellant can hardly claim surprise that the Government sought to test the basis for that characterization. *See, e.g.*, *Michelson*, 335 U.S. at 485 (noting that defendants "have no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense").

We do not find the military judge abused his discretion in allowing trial counsel to test Mr. BB's opinion by asking about the prior sexual assault allegation. Having conducted our own analysis under Mil. R. Evid. 403, we conclude the relevance of testing the basis for Mr. BB's opinion was not substantially outweighed by the danger of unfair prejudice. The Government was not required to let Mr. BB's testimony go unanswered or its basis untested, and therein lay the relevance of the Government's question. While the question was assuredly prejudicial, we do not characterize it as *unfairly* prejudicial in light of the fact it was the Defense which brought Mr. BB's testimony in the first place. We also note only a single question on the matter was asked, and Mr. BB disavowed any knowledge of the allegation. The question was devoid of specific details and only asked if Mr. BB knew Appellant had been *accused* of committing sexual assault. In *Pearce*, the CAAF noted that the fact a person has been merely investigated for an offense is "if anything, mitigating" because "[m]any an innocent person has been investigated, merely to be exonerated." 27 M.J. at 124. We see no difference here. Therefore, we conclude Mil. R. Evid. 403 would not operate to prohibit the question posed by the Government in Appellant's case.

However, even if the military judge erred in allowing this information to be presented, we ask whether "the error substantially influenced the adjudged sentence." *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005) (citing *United States v. Boyd*, 55 M.J. 217, 221 (C.A.A.F. 2001)). We conclude that it

---

[21] Notably, if the Government had sufficient evidence of Appellant committing a prior sexual assault, the Government had the ready ability to offer such evidence under Mil. R. Evid. 413.

did not. The military judge's instruction told the members they could not consider the allegation as being true in light of Mr. BB's testimony that he was unaware of it. Absent evidence to the contrary, we may "presume that members follow[ed] [the] military judge's instructions."[22] *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). In addition, trial counsel did not return to the allegation during sentencing argument or otherwise seek to capitalize on it. Thus, we see no indication the question operated to substantially influence Appellant's sentence.

## F. Allegations of Ineffective Assistance of Counsel

At trial, Appellant was represented by his detailed military counsel, Major (Maj) TK, along with two civilian counsel, Mr. JO and Ms. MK. On appeal, Appellant asserts that his counsel committed numerous errors which cumulatively deprived him of the effective assistance of counsel. He specifically raises 12 different alleged deficiencies, 11 of which we discuss below—several of which we consolidate for our analysis.[23] Based on Appellant's allegations, we ordered and received declarations from his trial defense counsel which we consider in addressing his claims. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020).

### 1. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the

---

[22] Although one panel member asked for more information about the allegation, this occurred before the military judge had instructed the members on how they could consider the question put to Mr. BB.

[23] Appellant's twelfth alleged deficiency is based on his counsel agreeing to a two-month continuance relating to the post-trial Article 39(a), UCMJ, hearing. We conclude this allegation warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

If an appellant's allegations are true, we consider the following factors to determine whether the presumption of competence has been overcome: (1) whether "there a reasonable explanation for counsel's actions;" (2) whether defense counsel's level of advocacy fell "measurably below the performance" ordinarily expected of "fallible lawyers;" and (3) if defense counsel were ineffective, whether there is "a reasonable probability" there would have been a different result absent the ineffective representation. *Gooch*, 69 M.J. at 362 (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)); *see also Akbar*, 74 M.J. at 386 (applying same standard for defense counsel's performance during sentencing proceedings). Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome," instead, it must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

**2. Analysis**

Considering the entire record, the assertions Appellant makes in his assignments of error, along with trial defense counsel's declarations, we conclude that Appellant has not carried his burden to demonstrate he is entitled to relief. We examine each allegation in turn.

### a. Findings Instructions

Appellant claims his counsel were deficient in failing to object to the military judge's findings instructions to the extent they omitted the definition of "consent," as discussed in Section II(D), *supra*.

During the 11 May 2020 post-trial hearing on the issue of the missing instruction, Ms. MK said she wanted to "take a moment to foot stomp some

things for the appellate record" regarding the Defense's possible waiver of the issue "to highlight for the appellate court that if the [D]efense—if we missed it, the defense actions were IAC and insufficient." We note the acronym "IAC" typically stands for "ineffective assistance of counsel." She went on to explain that the Defense assumed the military judge would give "the standard instructions" for the abusive and aggravated sexual contact specifications, but they "did not see the language that was missing from the standard instruction." This led the military judge to ask Ms. MK whether she had read the draft instructions when they were first sent to the parties. Mr. JO answered,

> I reviewed the instructions that night. When I review the instructions, I'm reviewing for special language, I'm looking—I, I'm usually able to find a typo or two. Usually I'm able to find can instead of a can't, and that's what I'm looking for. I, I did not notice that the standard consent instruction was not there. . . . I mean we do the comparison with the electronic bench book[,] make sure everything measured up, measured up side to side, and all instructions that was comfortable [sic] with the Court's reading. If, [ ] the court would've had a consent instruction it would've said consent means you must say no, then I would've noticed, but . . . I did not notice the negative. And yeah, I mean it matched, it matched the drop down menu in the Army bench book.

The military judge pointed out that he had asked the parties if they had any objections after he read the instructions to the members in open court. Mr. JO explained that when the instructions are being read to the members, he just listens to determine whether the military judge accurately reads the instructions as written, and is not assessing whether additional instructions should be given. He said the fact the consent instruction was "missing altogether" was "quite frankly, something [he] did not see." The Defense argued the military judge should declare a mistrial, but the military judge declined to grant relief. As noted above, the military judge's ruling is absent from the record of trial docketed with this court.

In their declarations, all three counsel admit they overlooked the fact the instructions did not define consent. Mr. JO and Ms. MK say the electronic version of the *Benchbook* they used contained an error in which the consent instruction was omitted, but they have provided no further evidence in support of this claim.

Based upon trial defense counsel's own assertions, there was no strategic or tactical decision behind not objecting to the instructions—they thought the instruction should be given, but it was not. This was purely the result of oversight. Counsel suggest the problem arose from some flaw in the *Benchbook*, but

the *Benchbook* itself indicates it is designed to "assist military judges . . . in the drafting of necessary instructions" with "the pattern instructions . . . intended only as guides." *Benchbook* at 3. As noted above, the *Benchbook* is advisory in nature. *See Riley*, 72 M.J. at 122.

While we recognize that defense counsel—like all trial participants—are fallible, trial defense counsel perceived that their error here was so significant that they argued a mistrial was the only appropriate remedy. We have no ready ability to determine whether the version of the *Benchbook* being used at the time in fact omitted the instruction at issue, but that is of no moment, because the *Benchbook* is an aid to—not a replacement for—independent and competent legal analysis. Trial defense counsel had the obligation to carefully review the draft instructions and propose their own instructions based upon the facts of Appellant's case and the state of the law. Considering the Defense's strategy was to argue Ms. SW had consented to the conduct in question based upon her alleged prior sexual conduct with Appellant, we find it all the more difficult to excuse trial defense counsel's failure to ensure the military judge instructed the members on that precise point.

We conclude Appellant's counsel's conduct fell measurably below of that expected of attorneys on this point, but Appellant is only entitled to relief if he establishes there is a reasonable probability of a different result in the absence of the errors. *Gooch*, 69 M.J. at 362. We find he has not done so. Under the Defense's theory, the members needed to be put on notice that the fact Ms. SW had, on past occasions, initially rebuffed Appellant's advances but later consented to sexual activity could be used to assess whether she consented during the charged events, or, alternatively, that Appellant might have been mistaken about her consent. However, the military judge did, in fact, instruct the members on both points. First, he told the members that evidence of Ms. SW's past acts of sexual and physical contact "should be considered . . . on the issue of whether [she] consented to the sexual and physical acts with which the accused is charged." Second, he explained that the defense of mistake of fact applied to each of the charged offenses and that it was the Government's burden to prove beyond a reasonable doubt the defense did not apply. Moreover, the military judge explained that lack of consent was an element of the abusive sexual contact offense, which the Government was required to prove.

We are not convinced the missing instruction would have provided enough force to lead to Appellant's acquittal or otherwise undermine our faith in the verdict. That instruction would have told the members that all evidence concerning consent is relevant and must be considered, and that evidence of consent may cause the members to have a reasonable doubt as to whether the Government proved Appellant committed the offenses beyond a reasonable doubt. The remainder of the instruction would have described consent as "a

freely given agreement to the conduct at issue," and would have then included a number of examples of non-consent, such as an "expression of lack of consent through words or conduct." To the extent the members believed Ms. SW's testimony, this last point squarely cuts against Appellant, as she testified she repeatedly told him to stop. To be sure, the military judge's instructions would have been superior had he employed the recommended *Benchbook* instructions or the statutory definitions enshrined in the UCMJ, but the Defense's theory was adequately covered by the instructions that were given, and Appellant is entitled to no relief.

### b. Ms. SW's Recorded Interview

Appellant claims his counsel were deficient in allowing the Government to introduce the entirety of Prosecution Exhibit 1, Ms. SW's recorded interview with the Hoke County Sheriff's Office, discussed in Section II(C), *supra*.

At trial, the Defense agreed with the admission of the complete interview, even raising concerns that the members might receive something less than the entire recording. Appellant's argument is that this permitted the Government to present a "bolstering repetition of the allegation" without any strategic or tactical purpose. In his declaration, Mr. JO states he concluded the interview was "a mixed bag for both parties," and that "showing the entire video was more beneficial than showing only the portions which benefited the Government." Ms. MK echoes that sentiment, stating that "[w]hile the video contained statements by [Ms. SW] supporting the allegations . . . her demeanor during the report and discussion with law enforcement also contained information favorable to the Defense." Maj TK further explains that by showing the entire interview, the members were able to see Ms. JR interrupting the interview to "fill in the gaps or add her own perspective and details," as well as see Ms. JR's dislike of Appellant. This fed into a Defense theory that Ms. JR may have encouraged Ms. SW to fabricate the allegations or provided her incentive to do so.

Agreeing to admit the entire interview was a strategic choice on trial defense counsel's part. We do not find the choice unreasonable and we will not second-guess it. Indeed, one theory advanced by the Defense was that because Ms. SW did not tell the interviewers about any abuse committed by Appellant other than that which occurred on 23 May 2018, none of the allegations of prior abuse was true. Appellant was acquitted of the prior conduct, raising the inference that trial defense counsel's strategy worked to Appellant's advantage.

### c. Cross-examination of Ms. SW

Appellant argues his counsel were ineffective in failing to cross-examine Ms. SW on two of the four alleged specifications, the two specifications of which the members found Appellant guilty. Appellant submits it was "inexcusable in

any circumstance to *not even mention half the charge sheet* or try to defend the client on those specifications."

We are not convinced. A failure to cross-examine a witness does not itself constitute ineffective representation. *Grigoruk*, 52 M.J. at 315. In order to prevail in this argument, Appellant must show what the missing cross-examination "might reasonably have accomplished." *Id.*

According to Ms. MK, the Defense reviewed all of Ms. SW's available statements and interviewed her twice. Ms. MK's assessment was that Ms. SW presented as calm, polite, and respectful. Moreover, in considering her extensive discussions with Appellant, Ms. MK believed that cross-examining Ms. SW about the specifics of the events of 23 May 2018 "would not result in any favorable information for [Appellant]."

"The decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness'[s] testimony, requires a quintessential exercise of professional judgment." *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005). On cross-examination, Appellant's trial defense counsel sought to portray Ms. SW as being frustrated with her marriage and having a financial incentive to fabricate allegations of assault. They further elicited the fact that Ms. SW would sometimes initially not consent to Appellant's sexual advances but eventually acquiesce to them—an important part of the Defense's overall theory. Appellant's complaint on appeal is somewhat misleading in that it suggests trial defense counsel cross-examined Ms. SW about some alleged assaults, but not others. In reality, trial defense counsel only asked about one particular alleged assault, and only on the point that Ms. SW had made an inconsistent statement as to what physical position she and Appellant were in at the time. The remainder of the cross-examination was focused on eliciting support for the argument that Ms. SW consented to all the conduct and fabricated allegations of assault.

Our assessment is that the defense team made a strategic decision to approach cross-examination in the manner they did, informed by their pretrial interviews of Ms. SW. Considering Ms. SW had detailed the events of 23 May 2018 during her direct examination and that her earlier interview was admitted into evidence, an entirely reasonable course of action for the Defense was to *not* have her allegations repeated for a third time. Appellant has not suggested what lines of questioning trial defense counsel should have pursued, much less demonstrated either what information would have been obtained or how it would have helped his case. Without doing so, Appellant cannot prevail on this claim.

### d. Closing Arguments

Appellant argues his counsel were ineffective by giving a short closing argument which did not specifically address the 23 May 2018 events, comment on photographs of Ms. SW's bruises, or attempt to minimize Ms. JR's opinion about Ms. SW's character for truthfulness.

The Defense's closing argument was relatively streamlined, comprising four pages of the transcript, compared to the Government's 14-page argument. Nonetheless, it featured the Defense's core arguments: that sexual contact between Appellant and Ms. SW was consensual throughout their marriage; that Ms. SW would often say "no" at first, but then later consent; that Ms. SW had falsely accused Appellant for financial motives; that despite her trial testimony of long-lasting sexual abuse, Ms. SW married Appellant and never reported any abuse until she moved out of the house; that Ms. SW's testimony lacked detail as to when the alleged abuse prior to 23 May 2018 occurred; that when she made her report at the Hoke County Sheriff's Office, she made no reference to any of the other instances of abuse she alleged at trial; and that her report amounted to "my husband was mean to me" but evolved over time to be far more expansive. Trial defense counsel further pointed out that military law enforcement did not follow regulations and failed to record their interview with Ms. SW—depriving the members of the ability to see the changes in Ms. SW's allegations—and argued the Government only offered one of Ms. SW's statements to law enforcement, even though she gave five. Finally, trial defense counsel told the members to "pay attention" to the mistake of fact instruction.

"The right to effective assistance extends to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citations omitted). "Counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in [ ] closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id*. at 5–6. Closing argument serves to "'sharpen and clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id*. at 6 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). Thus, "[j]udicial review of a defense attorney's summation is therefore highly deferential . . . ." *Id*.

In her declaration, Ms. MK—who gave the closing argument—says she felt the Government's "overly long and technical" slide-based argument had left the members fatigued. She explains that, in her experience, "military panels prefer shorter, concise arguments."

Despite criticizing trial defense counsel for giving too short of a closing argument, Appellant offers little in the way of explanation as to how taking a different tack in closing would have resulted in a different outcome. Appellant

makes the sweeping generalization that "[i]t is inconceivable for counsel to not discuss half of the case" by not specifically talking about the 23 May 2018 events, yet he provides no indication of what he believes trial defense counsel should have said. As explained above, the Defense's approach was to paint sexual interactions between Appellant and Ms. SW during their marriage as routinely shifting from opposition to consent. Contrary to Appellant's assertion on appeal, Ms. MK did not carve the 23 May 2018 episode out of her argument—instead, she treated that complaint as false and characterized it as Ms. SW saying Appellant "was mean" to her.

Trial counsel argued that Ms. SW's bruises, which were photographed and admitted into evidence, corroborated her testimony. Essentially, the Government's theory was that some of the bruises were caused by Appellant grabbing her leg and by pinning her down. In making this argument, trial counsel told the members to look for "fingerprints" and "what looks like a thumbprint." Ms. MK did not refer to the bruises in her argument. On appeal, Appellant says Ms. MK "should have commented that the Government's failure to prove those fingerprints were [Appellant's] fingerprints is evidence of a conclusory, shoddy investigation." We, however, do not understand trial counsel's references to "fingerprints" to be fingerprints in the forensic-identification sense, and Appellant has offered nothing that would suggest a bruise can yield a fingerprint which could be matched with a suspect. Such a proposition runs counter to common human experience and seems implausible on its face—meaning, Appellant's proposed argument would have run the very real risk of losing credibility in the members' eyes.

During Ms. JR's testimony, trial counsel elicited her opinion that her sister was truthful. During cross-examination of one of the law enforcement witnesses, trial defense counsel demonstrated investigators had not attempted to determine whether Ms. SW was, in fact, a truthful person. In closing, trial counsel argued Ms. SW had a character for truthfulness, based upon Ms. JR's testimony. Ms. MK did not specifically refer to this character evidence in the Defense's closing argument; instead, she broadly cast Ms. SW as lying about her accusations. Appellant believes Ms. MK was deficient by not telling the members to discount Ms. JR's assessment based upon the facts Ms. JR is Ms. SW's sister and Ms. JR does not like Appellant. We are not convinced the absence of this comment is as significant as Appellant would have us conclude. For one, the military judge twice told the members that they should consider the witness's friendships, prejudices, "the relationship each witness may have with either side; and how each witness might be affected by the verdict." Moreover, Ms. JR's opinion apparently did not have as commanding an effect as Appellant now argues, given that the members acquitted him of the sexual assault and neck-grabbing offenses Ms. SW testified about.

Appellant would have us conclude the members would have acquitted him of all charges had trial defense counsel given a different closing argument, but he has failed to demonstrate that is a reasonable probability. Appellant was convicted of committing abusive and aggravated sexual contact on 23 May 2018. Ms. SW reported those offenses both to her sister and law enforcement shortly after they occurred. Photographs of her bruises corroborated her allegation, and her in-trial testimony was substantially similar to her initial report. In comparison, her testimony about the prior sexual assaults and neck-grabbing incident was vague, lacked specifics as to when those offenses occurred, and was undermined both by the fact she did not tell anyone about those offenses when they occurred and by her concession that sometimes she would consent to sexual activity that she initially objected to.

While other counsel may have given a different closing argument, Ms. MK's argument was well within the latitude afforded to trial defense counsel. Even if we assume for purposes of analysis that her argument did fall short, we are not persuaded Appellant would have seen a different result in his verdict.[24] In other words, Ms. MK has provided a reasonable explanation for giving the argument she did, her level of advocacy did not fall measurably below the performance ordinarily expected of fallible lawyers, and—even if she was ineffective—Appellant has not shown a reasonable probability that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362.

### e. Expert Consultants

Appellant next argues his counsel were ineffective by failing to request the appointment of a forensic pathologist and a fingerprint expert. He does not specifically explain what sort of information either expert would provide, but he contends they could have supported a theory that Appellant was "not so forceful" (because Ms. SW did not notice the bruises until Ms. JR pointed them out) or that the bruises "were attributable to another source."

According to Ms. MK, trial defense counsel did discuss the bruising with a medical consultant, and she determined "it was not an area where an expert would benefit [Appellant]." Mr. JO further explained that the Defense anticipated medical experts would likely corroborate, rather than refute, Ms. SW's version of events, based upon statements Appellant made to trial defense counsel. Appellant submitted a declaration in support of his complaint of ineffective

---

[24] Our dissenting colleague contends trial defense counsel were ineffective by not arguing the lack of evidence that Appellant touched Ms. SW's "groin," an argument which Appellant has not advanced on appeal. For the same reasons discussed in Section II(B)(3), *supra*, we are skeptical this argument would have gained traction with the members, and we conclude the absence of the argument does not amount to ineffectiveness.

assistance of counsel, but he does not address this issue. Thus, we have nothing before us indicating Appellant did not agree with this assessment at the time.

"[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *United States v. Anderson*, 55 M.J. 198, 201–02 (C.A.A.F. 2001) (alteration in original) (citing *Strickland,* 466 U.S. at 691). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

Appellant's perfunctory claim that expert assistance might have turned the tide in his case is insufficient to lead us to a conclusion his counsel were ineffective. He has not attempted to explain what information such assistance might have yielded or how it would have helped his case. He has not suggested that a fingerprint could be identified from a picture of a bruise or that an expert could look at the pictures and determine whether or not they corresponded with Ms. SW's description of the events. Instead, the information before us indicates trial defense counsel did seek medical guidance, determined expert assistance would not assist Appellant's case, and decided to focus their attention on other matters. We decline to conclude trial defense counsel needed to do more.

### f. Appellant's Decision to Not Testify

Just before Appellant's court-martial began, the military judge held an R.C.M. 802 conference with counsel from both sides. According to Maj TK, Mr. JO told the military judge—in the presence of trial counsel—that he "always put[s his] guy on the stand," or words to that effect. Surprised by this comment, Maj TK informed Appellant of this revelation.[25] As the court-martial progressed, all three defense counsel advised Appellant against testifying, and he ultimately decided not to do so.

In support of this appeal, Appellant submitted a declaration in which he asserts that after he learned about Mr. JO's comment, he "received conflicting advice from [his] defense counsel about whether or not [he] should testify." He

---

[25] In his declaration, Mr. JO asserts that what he said during the R.C.M. 802 conference was that "in a he-said, she-said case, one can expect the Accused to testify." We need not reconcile the differences between Maj TK's and Mr. JO's respective recollections. Because Maj TK, at the very least, understood Mr. JO's comment to be a declaration Appellant would testify, we will analyze this issue from Maj TK's recollection, as he was the one who first informed Appellant of what had occurred. Having considered the factors articulated in *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997), we conclude a post-trial hearing on this point is unwarranted.

also writes, "What made the difference for me in electing not to testify, when I had originally planned to and wanted to do so, was knowing that trial counsel had been notified of our intent and that he would be preparing his cross-examination that night accordingly."

In his declaration, Maj TK states that he was under the impression the decision as to whether or not Appellant would testify had not been made at the time of Mr. JO's comment. Maj TK also explains that while he did not agree with the disclosure, he also did not think Appellant testifying would be helpful to his case. Mr. JO and Ms. MK likewise took a dim view of Appellant testifying based upon his poor performance in mock examinations during trial preparation. All three defense counsel characterize Appellant as being agitated, emotional, and combative both in trial preparation and after hearing the testimony of the Government's witnesses. Mr. JO and Ms. MK note Appellant was prone to engaging in diatribes and making defamatory comments about Ms. SW during the practice examinations. Ms. MK says she was also concerned about Appellant's ability to control his anger on the stand and how he would respond to being confronted with alleged misconduct from his prior marriage. All three counsel say they had extensive discussions with Appellant about whether to testify and they emphasized to Appellant it was his decision whether or not to do so. Maj TK avers he provided Appellant this guidance both orally and in writing. After these discussions, Appellant decided not to testify on his own behalf.

Appellant argues there was no strategic reason to disclose that he would testify, and that by doing so, he was faced with the choice of "walk[ing] into a cross-examination a seasoned circuit trial counsel prepared on 24 hours advance notice or [forgoing] the opportunity to declare innocence and hope for the best." While some defense counsel may keep their client's decision to testify a secret in hopes of surprising trial counsel, we would imagine such a strategy would be ineffective against all but the most inexperienced prosecutors. The notion that a prosecutor would be unprepared for an accused to take the stand—especially in a case where the accused is the only other witness to the alleged events—strikes us as highly implausible. Appellant, meanwhile, was well aware he could be cross-examined because he had been practicing such with his counsel.

After the Defense rested its case, the military judge specifically asked Appellant if his decision to not testify in findings was his personal decision. Appellant stated, "Yes, Your Honor." While Mr. JO's statement in the R.C.M. 802 conference may have been one factor in Appellant's calculus, we see no indication that Appellant did not make a voluntary choice not to testify. By all accounts, trial defense counsel diligently worked with Appellant to prepare him for both being cross-examined as well as to intelligently determine whether or

not to testify. Appellant has not shown that Mr. JO's representation fell below the standards expected of defense counsel, and we do not find Mr. JO ineffective for disclosing Appellant's intent to testify.

### g. Absence of Unreasonable Multiplication of Charges Motion

Appellant next argues his counsel were ineffective in failing to raise a motion alleging unreasonable multiplication of charges in light of the fact both convicted offenses occurred within mere seconds of each other. Appellant faced a total confinement time of 27 years; he asserts that had such a motion been filed and granted, his maximum sentence to confinement would have been limited to 20 years. Appellant argues, "There [was] no strategic or tactical decision to not even try to lower the sentence."

Under R.C.M. 307(c)(4), "[w]hat is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." To determine whether charges have been unreasonably multiplied, judges assess such factors as whether the specifications are aimed at distinct criminal acts, whether they exaggerate or misrepresent the charged criminality, whether they unreasonably increase an accused's punitive exposure, and whether the prosecutor overreached in drafting the charges. *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). It is within a military judge's discretion to merge unreasonably multiplied charges for sentencing purposes. *See, e.g.*, *United States v. Campbell*, 71 M.J. 19, 25 (C.A.A.F. 2012).

In Appellant's case, he faced a maximum sentence to confinement of 20 years for the aggravated sexual contact offense (touching Ms. SW's groin) and 7 years for the abusive sexual contact offense (causing Ms. SW to touch his penis). 2016 *MCM*, pt. IV, ¶¶ 45.e.(3), (4). Arguably, these two offenses were part of Appellant's singular "transaction" of assaulting Ms. SW, but Appellant has failed to show how a reduction in his maximum sentence from 27 to 20 years would have resulted in a different adjudged sentence. Trial counsel told the members Appellant deserved "no less than seven years confinement and a dishonorable discharge," and the members adjudged three years, a dishonorable discharge, and reduction to the grade of E-1. Thus, Appellant was sentenced to a period of confinement well below either the 20-year sentence ceiling he would have faced after a favorable unreasonable multiplication ruling or trial counsel's recommended sentence. Appellant has not offered any explanation as to how a 20-year ceiling would have had any beneficial impact on Appellant's ultimate sentence, and we will not strain to contrive one for him. In failing to demonstrate any prejudice, Appellant's claim of error warrants no relief.

### h. Mr. BB's Testimony

Appellant argues his counsel were ineffective by eliciting Mr. BB's opinion in presentencing proceedings that Appellant would not hurt anybody, an opinion which permitted the Government to inquire about an allegation that Appellant had been accused of sexually assaulting his ex-wife.

In their declarations, all three of Appellant's trial defense counsel assert Mr. BB's statement caught them by surprise, as they had spent time preparing him for his testimony. Mr. JO says he specifically told Mr. BB not to attempt to impeach the verdict.

We note that Mr. BB's statement about how Appellant would not hurt anybody came at the tail end of a longer narrative response to the open-ended question, "can you describe [Appellant] for the panel?" After Mr. BB made this comment, trial defense counsel moved on to other topics, such as whether Mr. BB would help Appellant find employment. Trial defense counsel were aware of the ex-wife's allegation, as it was one factor they considered when advising Appellant on the risks of him testifying. Thus, the record lends credence to the post-trial declarations that trial defense counsel did not purposely elicit this opinion.

Mr. BB's overall testimony was favorable to Appellant, portraying him as being a good friend and a good father, so the fact the Defense elected to call him as a witness for sentencing amounts to an unremarkable strategic choice. In questioning Mr. BB, Ms. MK could have attempted to ask more specific questions to constrain his answers, but that is not a degree of perfection we will impose upon counsel in our hindsight review of her performance. Based upon on all three trial defense counsel's declarations, we are convinced they made an informed and calculated decision to present rehabilitation-potential testimony in the hopes of obtaining a favorable sentence for Appellant. Mr. BB—a lay witness—offered an opinion he likely believed would be helpful to Appellant, not appreciating the consequences that would erupt. We see nothing to indicate trial defense counsel purposely elicited this particular aspect of his testimony, and we harbor no delusions that counsel can precisely predict how a witness will answer any given question, no matter how extensive their trial preparation. As with all witnesses, trial defense counsel took a risk by calling Mr. BB in the hopes of casting Appellant in a favorable light. This is precisely the sort of tactical decision we give great deference to, and we will not second-guess it on appeal. *See Mazza*, 67 M.J. at 475.

### i. Victim's Unsworn Statement

Ms. SW intended to provide an unsworn statement to the court-martial. After reviewing a written copy of her proposed statement, Mr. JO objected on the basis that it referred to offenses for which Appellant was acquitted (i.e.,

grabbing her neck on one occasion and sexually assaulting her on divers occasions). Specifically, the Defense objected to the following line: "I was uncertain if anyone would even listen to me or if anyone would take me seriously or if they would just ignore me the way [Appellant] did whenever I told him no or stop." Trial defense counsel's position was that Ms. SW was referring to "multiple encounters" of which Appellant was acquitted.

Trial counsel briefly argued Appellant had been convicted of committing abusive sexual contact on Ms. SW while she was saying "no" and "stop," and thus Ms. SW's references to abuse would fairly include the offenses of which he was convicted. Prior to obtaining a ruling from the military judge, however, Mr. JO announced, "Sir, I withdraw. I withdraw. If the [G]overnment—[i]f they don't want to modify it, that's fine with me. I withdraw."

Appellant argues his counsel were ineffective by withdrawing their objection to Ms. SW's victim unsworn statement, effectively waiving the matter on appeal. Appellant asserts there was no strategic or tactical reason not to obtain a ruling from the military judge. In his declaration, Mr. JO explains he withdrew the objection out of concern that Ms. SW might take the opportunity to write "a much more powerful unsworn" than the "benign" one before the court. We have carefully considered Ms. SW's relatively short statement, and we conclude that while one could interpret the statement to refer to abuse throughout her relationship with Appellant, one could also read it to simply pertain to the events of 23 May 2018. Trial defense counsel's tactical decision to withdraw the Defense's objection in order to circumvent the risk that Ms. SW would add more prejudicial information was not unreasonable, and we decline to find trial defense counsel ineffective. Even if we had concluded Appellant's counsel were ineffective, we would not find any likelihood Appellant was prejudiced in light of the fact the members who heard the unsworn statement had also heard Ms. SW's testimony about abuse throughout the relationship. By acquitting Appellant of that conduct, the members had already determined that it had not been proven beyond a reasonable doubt, so it is extremely unlikely they would be influenced by Ms. SW's vague allusions to the conduct in an unsworn statement. Moreover, the military judge instructed the members that Appellant was "to be sentenced only for the offenses of which he [had] been found guilty," and we presume the members followed the military judge's instructions. *See Taylor*, 53 M.J. at 198.

### j. Conclusion on Ineffective Assistance Claims

We evaluate trial defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998) (additional citation omitted)). Even

when an appellant overcomes the strong presumption that counsel's performance was within the wide range of reasonable professional assistance, relief is only available when the appellant can establish a reasonable probability of a different outcome had the ineffective assistance not occurred. Appellant has failed to establish that relief is warranted in his case under the theory of ineffective assistance of counsel.

## G. Government Findings Argument

Appellant contends trial counsel's closing argument improperly commented on his right to remain silent and that we should set aside the findings and sentence of his court-martial to remedy the error. We disagree and decline to grant Appellant's requested relief.

### 1. Additional Background

During his closing argument, circuit trial counsel told the members that in order to find Appellant had established a mistake of fact defense, they had to conclude Appellant was actually mistaken and that his mistake was reasonable. Trial counsel described the "actually mistaken" element of the defense as the mistake having "to have existed in the mind of the accused. Meaning, it had to actually be there. He had to actually think that she was consenting. It had to be an honest mistake." From this proposition, trial counsel argued,

> Now, let's turn to that first piece there. Let's talk about "honest." "It's not rape. We are married." "It's not rape. We're married." Is someone who says that—Is someone who says that mistaken about the consent of the other person or does that indicate they have knowledge of what they're doing; they have knowledge that the other person is not consenting[?] They have knowledge of it and they're talking about it, they're categorizing it, they're classifying it as a rape as something that is against the law. Is any mistake of fact honest when someone says those words? Okay. We can't get into his mind unless he tells us what's in his mind. And he told you—

At that point, trial defense counsel asked for an Article 39(a), UCMJ, hearing in order to move for a mistrial. In this hearing and outside the members' presence, trial defense counsel argued that the comment "unless he tells us" was an improper comment on Appellant's right to remain silent. Circuit trial counsel countered that he was referring to what Appellant had said to Ms. SW during the charged offenses. The military judge denied the motion, concluding that trial counsel was "specifically talking about the statement that was already into evidence, that it's not rape if you are married, and using that to demonstrate what was arguably in the accused's mind at the time he committed the offenses." The military judge said circuit trial counsel's final comment,

41

"[h]e told you," further placed the argument in context. Nonetheless, the military judge granted the Defense's request for a curative instruction.

When the members returned to the courtroom, the military judge advised them:

> Members of the Court, you have heard in the [G]overnment's closing argument that one will not know what is in [Appellant's] mind unless he tells us. As you have witnessed, [Appellant] has elected not to testify. You have taken an oath, and along with such oath, you have agreed not to consider the fact that [Appellant] did not testify. You must follow such an oath. The [G]overnment is also prohibited from commenting on [Appellant] exercising this right.

Circuit trial counsel then resumed his argument by saying, "The mistake of fact as to consent must be honest. Is it an honest mistake if the accused says, it's not rape if you're married? Honest." From there, circuit trial counsel moved on to a discussion about whether such a mistake could be reasonable.

**2. Law**

Whether a trial counsel's comments in closing argument improperly reference an accused's constitutional right to remain silent is a question of law we review de novo. *See United States v. Flores*, 69 M.J. 366, 369 (C.A.A.F. 2011) (citing *United States v. Moran*, 65 M.J. 178, 181 (C.A.A.F. 2007)).

"It is black letter law that a trial counsel may not comment directly, indirectly, or by innuendo, on the fact that an accused did not testify in his defense." *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990) (citing *Griffin v. California*, 380 U.S. 609 (1965)). "Regardless of whether there was an objection or not, '[i]n the context of a constitutional error, the burden is on the Government to establish that the comments were harmless beyond a reasonable doubt.'" *Flores*, 69 M.J. at 369 (alteration in original) (quoting *United States v. Carter*, 61 M.J. 30, 35 (C.A.A.F. 2005)).

We examine prosecutorial comments "in light of [their] context within the entire court-martial." *Carter*, 61 M.J. at 33 (citation omitted). "[W]hether [an] error is harmless beyond a reasonable doubt 'will depend on whether there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction.'" *United States v. Paige*, 67 M.J. 442, 451 (C.A.A.F. 2009) (alteration in original) (quoting *Moran*, 65 M.J. at 187). To find that an error did not contribute to the conviction is "to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Moran*, 65 M.J. at 187 (quoting *Yates v. Evatt*, 400 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).

### 3. Analysis

In looking at trial counsel's argument, and the context of the entire court-martial, we find no error. When trial counsel made this comment, he was addressing Appellant's defense of mistake of fact and how Appellant's comments to Ms. SW provided evidence of Appellant's mindset at the time of these offenses. This was a proper argument which did not refer to Appellant's decision not to testify, either explicitly or implicitly.

Even if we were to conclude the argument amounted to constitutional error, we would find such error to be harmless. In *United States v. Chisum*, the CAAF explained that a "constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 77 M.J. 176, 179 (C.A.A.F. 2018) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003)). Here, trial counsel's commentary on whether Appellant was honestly mistaken was brief and narrowly tailored to one prong of the defense of mistake of fact. The military judge further provided the members a curative instruction in the middle of trial counsel's argument. We presume court members follow instructions by a military judge, unless we have evidence to the contrary. *Taylor*, 53 M.J. at 198. Finally, the members returned a mixed verdict, acquitting Appellant of some offenses while convicting him of others—a strong indication the members arrived at their verdict unimpacted by any belief Appellant's decision not to testify should be held against him. We conclude that the members would have reached the same verdict even in the absence of circuit trial counsel's "unless he tells us" comment. Appellant is entitled to no relief on this point, even if we were to conclude the Government's argument constituted error.

## H. Sentence Appropriateness

Appellant contends his sentence is inappropriately severe. He argues his convictions arose from "a matter of seconds" and was "not nearly as bad or violent as other crimes that yield the same type of punishment." He theorizes his sentence was as high as it was because the Government painted him as a serial offender through the question put to Mr. BB about Appellant's ex-wife's allegation Appellant had sexually assaulted her. He asks us to reduce his sentence to confinement, but we decline to do so.

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296

(C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

Appellant faced a maximum sentence of a dishonorable discharge, confinement for 27 years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. 2016 *MCM*, pt. IV, ¶¶ 45.e.(2), (3). His adjudged sentence consisted of a dishonorable discharge, confinement for three years, and reduction to the grade of E-1.

Appellant is correct that the conduct of which he was convicted spanned a relatively short timeframe. While his offenses may not have lasted a long time, Appellant used his physical strength to overpower his wife's physical and verbal resistance in order to molest her and force her to touch his penis.

Appellant suggests his sentence was influenced by the question that Mr. BB was asked, but the military judge instructed the members as to the proper use of that information, specifically advising them that "there is no evidence that [Appellant] assaulted his ex-wife." Appellant has not pointed to anything in the record that would lead us to conclude the members failed to follow that instruction or that they improperly inflated Appellant's sentence because of it.

We have considered Appellant, the nature and seriousness of the offenses, his long record of military service, the lack of any previously documented misconduct in his personnel records, and all matters he submitted in his case in extenuation, mitigation, and clemency. We conclude his sentence is not inappropriately severe.

## I. Completeness of the Record

Although not raised by Appellant, we consider whether the record is substantially complete in the face of a missing appellate exhibit, the military judge's post-trial ruling regarding his omission of the definition of consent in his findings instructions.

### 1. Additional Background

In late May 2020, the military judge issued his ruling pertaining to the post-trial Article 39(a), UCMJ, hearing. Both parties, in their submissions to

this court related to this appeal, referred to this ruling as Appellate Exhibit XXXVIII and commented on the substance of the ruling. The ruling, however, was not included in the record of trial docketed with this court.

We issued the Government an order to show cause why we should not remand the record for correction. In response, the Government submitted a declaration from the circuit trial counsel who participated in Appellant's court-martial. This circuit trial counsel asserts that once the Government received our show-cause order, he located the military judge's email with the ruling attached, and he attached the ruling to his declaration. The ruling is unsigned and has no appellate exhibit number on it. We granted the Government's motion to attach the declaration. The Government asks us not to remand the case or grant other relief; Appellant, on the other hand, submits that the only way to remedy the defective record is to remand it for correction. Appellant concedes the ruling attached to the declaration appears to be "identical" to the one in the possession of his appellate counsel.

The military judge's ruling concludes Appellant waived the error with respect to the military judge's consent instructions, and if the error was simply forfeited, Appellant was not prejudiced. The military judge generally concluded that his instructions otherwise addressed the matter of consent and that, in any event, the term "consent" is generally known and further definition was not needed. The ruling briefly notes that whether trial defense counsel were ineffective was "outside the purview" of the military judge, and the ruling contains no substantive discussion of the matter.

**2. Law**

We review the question of whether a record of trial is complete de novo. *United States v. Stoffer*, 53 M.J. 26, 27 (C.A.A.F. 2000). A complete record of trial includes all appellate exhibits. R.C.M. 1112(b)(6); R.C.M. 1112(d)(2). An incomplete or defective record of trial may be returned to the military judge for correction. R.C.M. 1112(d)(2).

When an omission from a record of trial is substantial, such omission gives rise to a presumption of prejudice which the Government must rebut. *United States v. Harrow*, 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006) (citation omitted), *aff'd*, 65 M.J. 190 (C.A.A.F. 2007). Insubstantial omissions, however, do not give rise to such a presumption "or affect that record's characterization as a complete one." *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000). We approach the question of what constitutes a substantial omission on a case-by-case basis. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted).

### 3. Analysis

We considered the circuit trial counsel's declaration and its attachment to resolve this issue which was raised by the record. *See Jessie*, 79 M.J. at 444. Although we have the authority to return the record to the military judge for correction under R.C.M. 1112(d)(2), we decline to do so because even if the exhibit's omission is substantial, we conclude Appellant has not been prejudiced by the exhibit's omission.[26] We arrive at this determination because we have already concluded Appellant waived the error with respect to the military judge's findings instructions. Except for a passing reference to Appellant's ineffective assistance claims, the military judge's ruling exclusively addresses the question of whether he erred in providing the instructions he did. Because Appellant waived this issue, however, the military judge's post-trial ruling on it adds nothing material to the record. Similarly, because the ruling provides virtually no discussion of the ineffective assistance claim—a claim which we have considered—the ruling has no impact on that issue. Appellant acknowledges he had an apparently "identical" copy of the ruling when he submitted his assignment of errors, so Appellant has not been deprived of any of the information in the military judge's ruling. As such, we conclude that even if we impose a presumption of prejudice, that presumption has been effectively rebutted by virtue of our review of the declaration and ruling submitted by the Government.

## J. Post-Trial Delay

Although not raised by Appellant, we consider whether he has been deprived of his due process right to speedy post-trial and appellate review.

Appellant's court-martial concluded on 16 January 2020, and the military judge entered judgment 134 days later, on 29 May 2020. The record of trial was not docketed with this court until 10 July 2020, which was 176 days after Appellant was sentenced. On 3 February 2022, Appellant demanded speedy appellate review. We are issuing our opinion more than 20 months after his case was docketed with us.

### 1. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (first citing *United States v. Rodriguez*, 60

---

[26] That we granted the Government's motion to attach does not change the fact that the ruling is still missing from the record of trial. Instead, we use the circuit trial counsel's declaration and its attached ruling in order to perform our responsibilities under Article 66, UCMJ, 10 U.S.C. § 866. *See, e.g.*, *United States v. King*, No. ACM 39583, 2021 CCA LEXIS 415, at *29–30 (A.F. Ct. Crim. App. 16 Aug. 2021) (unpub. op.).

M.J. 239, 246 (C.A.A.F. 2004); and then citing *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when the case is not docketed with the Court of Criminal Appeals within 30 days of convening authority action, or when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. In *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020), this court established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing for cases referred to trial on or after 1 January 2019, in light of the new post-trial processing procedures that went into effect on that date.

Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (first citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); and then citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

Where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

### 2. Analysis

Two periods of delay are facially unreasonable in Appellant's case under *Moreno*—the period from sentencing to docketing, and the period from docketing to the release of our opinion. The first period's standard is 150 days, and 176 days elapsed here. The second period's standard is 18 months, and we exceeded that standard by just over two months.

#### a. Sentence to Docketing

The period between sentencing and docketing exceeded the standard by 26 days—just under four weeks. Because Appellant did not raise this issue, the record is not completely developed with respect to the reasons for this delay. However, we note Appellant's case did involve a post-trial hearing on 11 May 2020, or 116 days after sentencing. This hearing was delayed by approximately

two months due to logistical issues related to the COVID-19 pandemic. The military judge issued his ruling and entered judgment in the case on 29 May 2020, or 134 days after sentencing. Once judgment was entered, the Government took six weeks to docket the case with our court, pushing the total period from sentencing to docketing to 176 days.

Appellant did not assert his right to speedy post-trial processing, and he has not claimed the delay during this period has prejudiced any of the interests cited by the CAAF in *Moreno*. Appellant has not alleged he has suffered from oppressive incarceration; he has not asked for a rehearing and we are not granting him one on our own accord; and he has not asserted any grounds for appeal have been impaired. From our review of the record, it appears that one primary reason for the lengthy post-trial processing was the need to convene a post-trial hearing to address the matter of the military judge's instructions. The scheduling of this hearing was complicated by the pandemic—a matter plainly outside the control of either Appellant or the Government. The hearing did not result in any relief to Appellant in terms of his sentence, and we therefore conclude he has not been prejudiced by the delay between his sentencing and the docketing of his case. We have also considered whether—in the absence of any cognizable prejudice—the delay in this case was so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, and thereby amount to a violation of Appellant's due process rights. Although we are at a loss to explain why it took the Government six weeks to simply docket the case with this court, we nevertheless conclude this delay was not so egregious as to warrant relief.

### b. Docketing to Opinion

In producing this opinion, we exceeded the 18-month standard by over two months. While this total period lasted over 600 days, 234 of those days—just over seven and a half months—are attributed to Appellant filing his assignments of error after he received five enlargements of time over the Government's objections. Once Appellant filed his assignments, which included allegations of ineffective assistance of counsel, we ordered each of his trial defense counsel to submit declarations in response. After these declarations were filed, the Government submitted its answer to Appellant's assignments of error, and Appellant filed a subsequent reply. From Appellant's initial brief to his reply, 71 days passed, bringing the total time elapsed since docketing to 305 days—just over ten months. We took over ten months to produce our opinion, during which time we issued a show-cause order to the Government after we identified a missing appellate exhibit. Although the period from docketing to the release of this opinion exceeded the 18-month threshold for facially unreasonable delay, this period was exceeded by just over two months. Appellant raised a total

of twelve issues for our consideration, resulting in a lengthy and divided opinion from our court. For the reasons noted above related to the period of post-trial processing, we conclude there is no evidence demonstrating prejudice warranting relief for the period between docketing and this opinion, nor do we see any indication that the delay in our review of his court-martial rose to the degree that it would adversely affect the public's perception of the military justice system.

### c. Relief Under Article 66(d), UCMJ

Recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), and the particular facts presented by Appellant's case, we conclude it is not.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

JOHNSON, Chief Judge (concurring in part and in the result):

I generally concur with the lead opinion, including the result, with one exception. With respect to Appellant's argument that a unanimous verdict of guilty is constitutionally required, the opinion notes Appellant cannot demonstrate that he was convicted by a less-than-unanimous vote of the court members. The implication of this observation is that, assuming *arguendo* the jury unanimity requirement did apply to courts-martial, Appellant would be required to make such a demonstration in order to secure relief. The Rules for Courts-Martial generally forbid polling court members to determine their votes, and their deliberations are—with very limited exceptions—generally privileged under the Military Rules of Evidence. *See* Rules for Courts-Martial 922(e), 1007(d); Mil. R. Evid. 509, 606 (*Manual for Courts-Martial, United States* (2019 ed.)). To the extent the lead opinion implies that the Rules for Courts-Martial or Military Rules of Evidence might effectively interfere with the protection of a constitutional right, I respectfully disagree.

MEGINLEY, Judge, (dissenting in part and in the result):

I agree with the court's finding that Specification 2 of Charge I (abusive sexual contact) is legally and factually sufficient. However, for the reasons stated below, I conclude Specification 1 of Charge I (aggravated sexual contact) is factually insufficient. Moreover, I find that by being denied the right to a unanimous verdict, Appellant was denied equal protection under the law. Accordingly, I would dismiss Charge I and its specifications with prejudice.

## A. Factual Sufficiency and Ineffective Assistance of Counsel Relating to Specification 1 of Charge I

In reviewing the entire record, I found Ms. SW to be very credible. I have little doubt that Appellant grabbed her hand and placed it on his penis, nor do I have much doubt that Appellant touched Ms. SW's vagina over her clothing. Also, there was virtually no evidence to reasonably suggest Ms. SW consented to Appellant's acts on 23 May 2018, or that she fabricated Appellant's crimes for financial gain.

The issue I see is not with Ms. SW, but with the way the Government charged the allegation in Specification 1 of Charge I—that Appellant touched Ms. SW's *groin* with his hand. From Ms. SW's statement to local authorities and then later during her in-court testimony, *Ms. SW never said Appellant touched her groin*, as Appellant was charged. Perhaps Appellant touched Ms. SW in her groin as he was positioning himself on top of her, trying to pull her shorts down, and touching her vaginal region—especially given the bruising on her legs, which was indicative of that struggle. Ms. SW described how Appellant "hooked his fingers underneath [her] shorts and started moving his hands down towards [her] vagina." She also testified that Appellant "got down pretty far," in the context of trying to pull her shorts off, and that he was touching her "close to the outside of [her] vagina." And of course, she testified to the bruising on her legs. Yet notwithstanding this testimony, the majority does not know—nor did the members know—if Appellant actually touched her groin.

At first glance, this appears to be a possible oversight by trial counsel in their questioning of Ms. SW. Ms. SW was the Government's witness; the Government presumably discussed the case multiple times with Ms. SW and her special victims' counsel, charged the case based on the facts Ms. SW presented, and referred a charge to trial alleging that Appellant touched Ms. SW's groin. In order to try to glean the Government's intention, I reviewed of some of the pretrial papers—including the Hoke County Sheriff's Office report, the Air Force Office of Special Investigations (AFOSI) Report of Investigation, and the

Article 32, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 832,[1] Preliminary Hearing Officer (PHO) report. However, none of these of these documents contain evidence from Ms. SW stating that Appellant touched her in the groin area; the focus is on the fact that Appellant touched her in the vaginal area. In fact, in my review of the record, the only time a "groin" appears to be mentioned is in a document within the Article 32, UCMJ, PHO report, where Ms. SW stated she slapped Appellant between the legs (the Hoke County report states she hit him in the genitals). Based on the material available, it appears the Government may have adopted an extremely broad interpretation of what constitutes the groin—which, based on trial counsel's questioning of Ms. SW, included Ms. SW's vagina.

As the majority notes, our sister services have addressed this nuance. In *United States v. McDonald*, the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) determined that "groin" and "penis" are not synonymous, as the "groin" is "[t]he groove, and the part of the body around it, formed by the junction of the thigh with the abdomen, on either side." 78 M.J. 669, 680 (N.M. Ct. Crim. App. 2018) (alteration in original).[2] The NMCCA further noted that "groin" and "genitalia" are listed separately in the definition of "sexual contact" in Article 120, UCMJ, 10 U.S.C. § 920. *McDonald*, 78 M.J. at 680. In reference to an opinion by one of our sister service courts, the majority in this case notes,

> [T]he Army Court of Criminal Appeals [(ACCA)] concluded that the trial judge had failed to elicit a sufficient factual basis to support the appellant's guilty plea where he was charged with touching the victim's genitals but explained in his providence inquiry that he had touched the victim on her pubic mound, just above her genitals. The court concluded that substituting "groin" for the charged "genitals" during appellate review would amount to a material and possibly fatal variance under the theory that "'genitals' is not the same as 'groin' or 'groin area.'"

*Ante*, slip op. at 13 (quoting *United States v. Perez,* ARMY 20140117, 2016 CCA LEXIS 131, at \*5 (A. Ct. Crim. App. 29 Feb. 2016) (unpub. op.).

---

[1] All references in this dissent to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.). All other references to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.)

[2] The court cited J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER (Release No. 52 Sep. 2018).

The approach taken by our sister court makes sense, given the language of Article 120(g)(2)(A), UCMJ, 10 U.S.C. § 920(g)(2)(A), *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), in which "sexual contact" is defined as "touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person . . . ." "Groin" is not defined, nor is there any suggestion that the groin encompasses every body part from crease to crease. Significantly, genitalia and groin are listed separately.

Trial counsel in Appellant's case may have made a similar error as counsel in *McDonald* and *Perez*. In his closing argument, trial counsel stated:

> But she doesn't give up, she keeps fighting. And with his other hand, he tries to pull her thigh[s] apart because she's trying to keep them together to keep him from sticking his hands between her legs on her vagina, in her *groin*. And so he grabs her left thigh and he yanks it, he tries to push it. He tries to overpower her. And they're struggling, they're fighting back and forth. And he's able to touch her over the clothes in her *groin* area over her vagina.

(Emphases added).

Trial counsel's argument takes some liberty with Ms. SW's actual testimony, but without Ms. SW describing what happened in more detail, the members were left with making assumptions that Appellant's touching of Ms. SW's vaginal area was the same as touching her groin. The majority opinion is comfortable making that determination as well. I am not. I respectfully decline to say that the touching of Ms. SW's vagina, or close to the outside of her vagina, constitutes the groin. Any such suggestion that the groin can be expansively read to include the groinal area is a legal fiction under the 2016 *MCM*. The Government controls the charge sheet, *see United States v. Reese*, 76 M.J. 297, 301 (C.A.A.F. 2017), and could have alleged vagina, inner thigh, waist, and groin, all in the same specification. It chose not to. Thus, I can accept the majority's rationale in finding Specification 1 of Charge I legally sufficient—as articulated, for example, *ante*, slip. op. at 14 n.9. However, in holding the Government to its burden, I find this specification to be factually insufficient, as there simply was not enough evidence provided to the court-martial.

There is significant interplay between the Government's charging decision on Specification 1 of Charge I and two of Appellant's allegations of ineffective assistance of counsel. Assuming there was enough evidence to support a conviction, this court should nonetheless set aside the specification for ineffective assistance of counsel (IAC). To be clear, neither at trial, nor in his appeal, have

any of Appellant's counsel (trial or appellate) identified this issue, nor did Government counsel. Appellant alleged 12 instances of IAC—some of which are legitimate issues—but the issues worth reviewing more closely are the failure to adequately cross-examine Ms. SW and the deficient closing argument.

If trial defense counsel knew that trial counsel did not elicit enough testimony or present enough evidence to support the charge that Appellant touched Ms. SW's groin, the decision to limit Ms. SW's cross-examination to the penetrative offense could have been brilliant and worth a risk. The trade-off is that the panel would have to know that the Government's evidence was lacking—this fact is something that one would not reasonably suspect a panel to figure on its own. Yet, defense counsel failed to argue that the evidence was deficient. In what can be described as a perplexing and disconcerting closing argument, one could argue the Defense essentially conceded guilt to the 23 May 2018 incident, *not saying one word* in defense of Appellant's actions. In other words, had someone read the Defense's closing argument in a vacuum, that individual would not have known Appellant was charged with other crimes. Appellant's defense counsel latched onto consent and reasonable mistake of fact—which appears to have not existed for the 23 May 2018 incident—and Ms. SW's possible pecuniary interests, when the charging and evidence were flawed. There is nothing in the record to suggest they were not on notice as to what they were defending; in other words, they knew what they had to defend.

This is not to say Appellant would have been acquitted of both specifications relating to the 23 May 2018 incidents. However, when applying the test from *United States v. Gooch,* 69 M.J. 353, 362 (C.A.A.F. 2011), first, there is no reasonable explanation for counsel's actions—in fact, the explanation for this argument as articulated by Ms. MK (Appellant's civilian trial defense counsel), to be quite blunt, appears to be a significant blunder:

> I made the closing I believed appropriate for the evidence. Government counsel had made an overly long and technical argument with extensive [P]ower[P]oint slides and the panel appeared fatigued afterwards. In my experience, military panels prefer shorter, concise arguments. Merely because counsel does not comment on a particular piece of evidence does not foreclose it from consideration by the panel.

In this case, there is a reasonable probability, if not high probability that a technical argument would have earned an acquittal on this specification. Second, the level of advocacy fell measurably below the performance ordinarily expected of fallible lawyers. *See Gooch*, 69 M.J. at 362. There may have been a strategy behind a brief closing argument, but few criminal law litigators would adhere to this tactic. Third, I firmly believe there is a reasonable probability that there would have been a different result but for this misstep. *See id.* The

military judge did not give a definition of groin. There were no instructions on exceptions, substitutions, or variances. We can surmise that at least three members voted to acquit Appellant of the penetrative offense. Had the Defense challenged what constituted the "groin" in closing, there is a reasonable probability that there would have been a review of the instructions, a judicial definition of "the groin," a revamped rebuttal argument by trial counsel, or maybe even the possibility of a motion pursuant to Rule for Courts-Martial (R.C.M.) 917.[3] The Defense's failure to raise this glaring issue is enough of a "probability sufficient to undermine confidence in the outcome," and for me, there exists "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *See United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (internal quotation marks and citations omitted).

Finally, this issue matters because given that there was a reasonable probability that there would have been a different result, the sentencing landscape would have dramatically changed. Appellant's maximum confinement time would have been reduced from 27 years to 7 years. It is highly unlikely that Appellant would have received three years for forcing his soon-to-be ex-wife to grab his penis as he was coming out of the shower.[4] I simply do not find Appellant's trial defense counsel's strategy to be reasonable, and I would find them ineffective in defending this specification.

---

[3] While "it is a well-known principle that '[w]ords generally known and in universal use do not need judicial definition,'" *United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (alteration in original) (quoting *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000)), note 10 of the majority opinion, *supra*, indicates that the use of the word groin is open to interpretation.

[4] I also believe Appellant's sentence to three years confinement is, on its face, inappropriately severe; however, such a sentence is not surprising given trial defense counsel's grave tactical error in allowing Mr. BB to testify, which opened the door to the "have you heard question" that Appellant's ex-wife had also accused Appellant of sexual assault. Specially, the panel asked the military judge, "Is it possible for the panel to learn more of the allegations [Appellant's] ex-wife made against him, specifically the nature of the claims in any findings related to them?" I have no doubt that the "have you heard question," related to an ex-wife, about an allegation that may have occurred in 2012, led to an increased sentence. Further, the military judge provided no meaningful explanation supporting his Mil. R. Evid. 403 balancing test other than to say, "Defense, you opened the door to that line of questioning through the, through your direct examination and so I find under [Mil. R. Evid.] 403, solely used to test this witness's knowledge or opinion, that the probative value is not substantially outweighed by unfair prejudice given that I'm also limiting trial counsel to just the one question on it." Allowing this information was prejudicial and arbitrary and constituted an abuse of discretion.

## B. Unanimous Verdict and *Ramos v. Louisiana*

Appellant claims that the United States Supreme Court's ruling in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), which requires unanimous verdicts in federal and state criminal trials, renders his convictions invalid.[5] *Ramos* made clear that a unanimous jury verdict in a felony trial is a fundamental right. *Ramos* does not change the long-standing precedent that the accused in a court-martial does not have a Sixth Amendment[6] right to trial by a jury of his peers. However, numerous military court decisions have applied constitutional rights to servicemembers—including a Fifth Amendment[7] right to a fair and impartial panel. Continuing in that tradition, I find the lack of a unanimous panel verdict deprived Appellant of his constitutional right to equal protection under the law—especially when a potentially nonunanimous "conviction" triggers a sex offender registration requirement. I would therefore dismiss Charge I and its specifications without prejudice.

### 1. Congressional Authority to Legislate on Military Affairs

The Constitution gives Congress the power to raise, support, and regulate the armed forces under U.S. CONST. art. I, § 8 cl. 12–14.[8] Under this authority, Congress has enacted the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 801–946a, as well as the UCMJ's predecessors.

Article 29, UCMJ, 10 U.S.C. § 829, provides guidance for the assembly and impaneling of court members. Article 52 of the UCMJ authorizes non-unanimous verdicts, stating in relevant part:

> (a) IN GENERAL.—No person may be convicted of an offense in a general or special court-martial, other than—
>
> (1) after a plea of guilty under section 845(b) of this title (article 45(b));
>
> (2) by a military judge in a court-martial with a military judge alone, under section 816 of this title (article 16); or

---

[5] Appellant raises this assignment of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[6] U.S. CONST. amend. VI.

[7] U.S. CONST. amend. V.

[8] "[U]nder the Necessary and Proper Clause, Congress can give those rules force by imposing consequences on members of the military who disobey them." *United States v. Kebodeaux*, 570 U.S. 387, 400 (2013) (Roberts, C.J., concurring) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 416 (1819)).

(3) in a court-martial with members under section 816 of this title (article 16), by the concurrence of at least three-fourths of the members present when the vote is taken.

Article 52(a), UCMJ, 10 U.S.C. § 852(a).

Thus, at the time of Appellant's court-martial, concurrence of three-fourths of the members was required to convict.[9] Although Appellant's civilian defense counsel sought to poll the panel after the verdict, the military judge, in accordance with R.C.M. 922(e), denied the request. Accordingly, there is nothing in the record to indicate whether Appellant was convicted unanimously.

The Supreme Court traditionally grants Congress deference when it legislates on military affairs. For example, in *Solorio v. United States*, the Supreme Court stated:

The rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress.

---

[9] Historically, the number was even lower. For example, in 1912, during a hearing before the House of Representatives Committee on Military Affairs, The Judge Advocate General, Major General Enoch H. Crowder, recommended to the committee increasing the required vote to convict on a death-eligible offense from a simple majority of the panel to a two-thirds' vote. *See Revision of the Articles of War: Hearing on H.R. 23628 Before the H. Comm. on Military Affairs*, 62d Cong. 12, 47 (1912), *available at* https://www.loc.gov/rr/frd/Military_Law/pdf/hearing_comm.pdf [hereinafter 1912 Hearing], *cited in* Findings and Conclusions RE: Defense Motion for Appropriate Relief (Unanimous Verdict) at 12, *United States v. Dial*, general court-martial, Fifth Judicial Circuit, Kaiserslautern, Germany (3 Jan. 2022) [hereinafter *Dial* Ruling]. "Between 1912 and 1948, Article of War 43 required a majority vote for conviction for all offenses except death eligible ones (which required a two-thirds vote)." *Dial* Ruling at 13 (citing H.R. REP. NO. 81-491, at 49 (28 Apr. 1949), *available at* https://www.loc.gov/rr/frd/Military_Law/pdf/report_01.pdf). In 1948, via the Elston Act, Congress amended Article of War 43 to require a two-thirds vote for all offenses other than death-eligible ones. *See* Selective Service Act of 1948, S. 2655, 80th Cong. § 220 (1948), *available at* https://www.loc.gov/rr/frd/Military_Law/pdf/act-1948.pdf. In the Military Justice Act of 2016, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016), Congress increased the votes required in non-capital cases from two-thirds to three-fourths. *Id.* at § 5235. Reviewing the Report of the Military Justice Review Group, it appears the only reason for the change was to "eliminate inconsistencies and uncertainties in court-martial voting requirements by standardizing the requirements for each type of court-martial." REPORT OF THE MILITARY JUSTICE REVIEW GROUP 457 (22 Dec. 2015), *available at* https://ogc.osd.mil/Portals/99/report_part1.pdf.

483 U.S. 435, 440 (1987) (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953) (plurality opinion)).

The Court further noted:

> Congress has primary responsibility for the delicate task of balancing the rights of [servicemembers] against the needs of the military. As we recently reiterated, "judicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged."

*Id.* at 447 (omission in original) (quoting *Goldman* v. *Weinberger*, 475 U.S. 503, 508 (1986)).

### 2. Sixth Amendment Right to "Jury Trial"

The Sixth Amendment to the United States Constitution states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury of the State and district wherein the crime shall have been committed*, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. CONST. amend. VI (emphasis added).

However, "there is no Sixth Amendment right to trial by jury in courts-martial." *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (citations omitted); *see also United States v. McClain*, 22 M.J. 124, 128 (C.M.A. 1986). Additionally, "[a] service member has no right to have a court-martial be a jury of his peers, a representative cross-section of the community, or randomly chosen." *United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004) (citing *Ex parte Quirin*, 317 U.S. 1, 39–41 (1942)) (additional citations omitted).

In 1950, the Supreme Court opined that "[t]he right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by *courts-martial* or military commissions. . . . The constitution of *courts-martial*, like other matters relating to their organization and administration, *is a matter appropriate for congressional action.*" *Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) (emphases added) (citations omitted). Thus, *Whelchel* appears to lay to rest any question that the Court's rulings in *Ex parte Milligan*, 71 U.S. 2, 123 (1866), or *Quirin*, only referred to military commissions or commission cases.

Our superior court, the United States Court of Appeals for the Armed Forces (CAAF), has consistently abided by the precedent set forth by the Supreme Court that the Sixth Amendment right to trial by jury does not apply to courts-martial. Of note, however, the discussion on the right to a "jury trial" often focuses on the lack of a right to a "representative cross-section" of the accused's community. For example, the CAAF and its predecessor have noted that "[c]ourts-martial are not subject to the jury trial requirements of the Sixth Amendment, and, therefore, military members are not afforded a trial in front of a representative cross section of the military community." *United States v. Riesbeck*, 77 M.J. 154, 162 (C.A.A.F. 2018) (citing *McClain*, 22 M.J. at 128); *see also Easton*, 71 M.J. at 175–76 ("By enacting Article 29, UCMJ, as it did, Congress evinced the intent that, in light of the nature of the military, an accused does not have the same right to have a trial completed by a particular court panel as a defendant in a civilian jury trial does."); *United States v. Tulloch*, 47 M.J. 283, 285 (C.A.A.F. 1997) ("[S]ervicemembers do not have the right in a court-martial to a jury panel drawn from a representative cross-section of the population . . . ."); *United States v. Smith*, 27 M.J. 242, 248 (C.M.A. 1988) ("The Sixth Amendment grants defendants in criminal cases the right to a jury trial. This right includes a requirement that the jury be drawn from a representative cross-section of the community. However, the right to trial by jury has no application to the appointment of members of courts-martial.").

However, as will be discussed below, the CAAF and its predecessor court have imported certain other constitutional protections pertaining to juries and applied them to courts-martial panels.

### 3. Due Process and Equal Protection Application to Servicemembers

The Fifth Amendment to the United States Constitution states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, *except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger*; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. amend. V (emphasis added).

Servicemembers have a right to due process of law under the Fifth Amendment. *United States v. Witham*, 47 M.J. 297, 301 (C.A.A.F. 1997). This includes,

in certain circumstances, the "right to equal protection [as] a part of due process under the Fifth Amendment." *Id.* (citation omitted).

Despite our court's deference to Congress, Congress is still "subject to the requirements of the Due Process Clause when legislating in the area of military affairs . . . . But in determining what process is due, courts must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces." *Weiss v. United States*, 510 U.S. 163, 176–77 (1994) (internal quotation marks and citations omitted). "The tests and limitations of due process may differ because of the military context." *Id.* at 177 (internal quotation marks and citation omitted).[10] As stated in *United States ex rel. Toth v. Quarles*:

> [I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. But trial of soldiers to maintain discipline is merely incidental to an army's primary fighting function. To the extent that those responsible for performance of this primary function are diverted from it by the necessity of trying cases, the basic fighting purpose of armies is not served. . . . [M]*ilitary tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts.*

350 U.S. 11, 17 (1955) (emphasis added).

"An 'equal protection violation' is discrimination that is so unjustifiable as to violate due process." *United States v. Akbar*, 74 M.J. 364, 405–06 (C.A.A.F. 2015) (quoting *United States v. Rodriguez-Amy*, 19 M.J. 177, 178 (C.M.A. 1985)). Whether such a violation exists may depend on whether distinctions involve "suspect classifications" or encroach on fundamental constitutional rights:

---

[10] In *Weiss*, a case where the appellants challenged the appointment of military judges, Justice Ginsburg observed:

> The care the Court has taken to analyze petitioners' claims demonstrates once again that men and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service. Today's decision upholds a system of military justice notably more sensitive to due process concerns than the one prevailing through most of our country's history, when military justice was done without any requirement that legally trained officers preside or even participate as judges.

*Id*. at 194 (Ginsburg, J., concurring).

> For the Government to make distinctions does not violate equal protection guarantees unless constitutionally suspect classifications like race, religion, or national origin are utilized or unless there is an encroachment on fundamental constitutional rights like freedom of speech or of peaceful assembly. The only requirement is that reasonable grounds exist for the classification used.

*United States v. Means*, 10 M.J. 162, 165 (C.M.A. 1981) (first citing *Oyler v. Boles*, 368 U.S. 448 (1962); and then citing *United States v. Batchelder*, 442 U.S. 114 (1979)).

In other words, for cases not involving substantive constitutional rights, "equal protection is not denied when there is a reasonable basis for a difference in treatment." *Akbar,* 74 M.J. at 406 (quoting *United States v. McGraner*, 13 M.J. 408, 418 (C.M.A. 1982)).[11] Under a rational basis test, the burden is on an appellant to demonstrate that there is no rational basis for the rule he is challenging. The proponent of the classification "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "As long as there is a plausible reason for the law, a court will assume a rational reason exists for its enactment and not overturn it." *United States v. Paulk*, 66 M.J. 641, 643 (A.F. Ct. Crim. App. 2008) (first citing *Heller*, 509 U.S. at 320; and then citing *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938)).

In *United States v. Begani*, the Navy-Marine Corps Court of Criminal Appeals acknowledged that "[l]aws burdening fundamental rights are subjected to strict scrutiny and will be sustained only if they are '*necessary* to promote a *compelling* governmental interest.'" 79 M.J. 767, 777 (N.M. Ct. Crim. App. 2020) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972)), *aff'd*, 81 M.J. 273 (C.A.A.F. 2021), *cert. denied*, __ U.S. __, 142 S. Ct. 711 (2021). Yet, our sister court also wrote, "While there is no question the right to a grand jury and the right to a trial by jury are fundamental constitutional rights, *they are only fundamental to the extent (and to the persons to whom) the Constitution grants them in the first place*." *Id.* at 776 (emphasis added).

---

[11] "Absent a suspect classification or interference with a fundamental right, all that is needed for the statute to withstand constitutional scrutiny is a rational basis for the distinction between Appellant and future capital appellants." *United States v. Hennis*, 77 M.J. 7, 10 (C.A.A.F. 2017) (first citing *Akbar*, 74 M.J. at 406; and then citing *Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010)).

### 4. Military Justice System Incorporates Constitutional Protections

"[A] court-martial is now the only place in America where a criminal defendant can be convicted without consensus among the jury." Nino Monea, *Reforming Military Juries in the Wake of Ramos v. Louisiana*, 66 Naval L. Rev. 67, 72 (2020) [hereafter Monea].Virtually all the other provisions of the Sixth Amendment have already been incorporated into the military justice system:[12]

*a. Right to Speedy Trial:* "In the military justice system, an accused's right to a speedy trial flows from various sources, including the Sixth Amendment, Article 10 of the Uniform Code of Military Justice, and R.C.M. 707 of the Manual for Courts-Martial." *United States v. Cooper,* 58 M.J. 54, 57 (C.A.A.F. 2003); *see also United States v. Danylo,* 73 M.J. 183, 186 (C.A.A.F. 2014).

*b. Right to Public Trial:* "Without question, the [S]ixth [A]mendment right to a public trial is applicable to courts-martial." *United States v. Hershey,* 20 M.J. 433, 435 (C.M.A. 1985) (citing *United States v. Grunden,* 2 M.J. 116 (C.M.A. 1977)).

*c. Right to Confront:* "We hold that where testimonial hearsay is admitted, the Confrontation Clause is satisfied only if the declarant of that hearsay is either (1) subject to cross-examination at trial, or (2) unavailable and subject to previous cross-examination." *United States v. Blazier,* 69 M.J. 218, 222 (C.A.A.F. 2010).

*d. Right to Notice:*

> The rights at issue in this case are constitutional in nature. The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law," U.S. CONST. amend. V, and the Sixth Amendment provides that an accused shall "be informed of the nature and cause of the accusation," U.S. CONST. amend. VI. Both amendments ensure the right of an accused to receive fair notice of what he is being charged with.

*United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011) (citations omitted); *see also United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (applying the protections of the Fifth and Sixth Amendments to set aside convictions under Article 134, UCMJ).

*e. Right to Compel:* "The right to present a defense has many aspects. Under the Compulsory Process Clause, a defendant has a 'right to call witnesses whose testimony is material and favorable to his defense.'" *United*

---

[12] With the exception, for example, of the Vicinage Clause in the Sixth Amendment.

*States v. Bess*, 75 M.J. 70, 75 (C.A.A.F. 2016) (quoting *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)).

   ***f. Right to Counsel:*** "The first question we address is when did appellant's right to counsel under the [S]ixth [A]mendment attach. . . . In the military, this sixth-amendment right to counsel does not attach until preferral of charges." *United States v. Wattenbarger*, 21 M.J. 41, 43 (C.M.A. 1985) (citations omitted).

   ***g. Right to the Effective Assistance of Counsel:*** "The Sixth Amendment guarantees a criminal accused, including military service members, the right to effective assistance of counsel." *Gooch*, 69 M.J. at 361 (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)).

## 5. Judicial Recognition of *Jury-Related* Constitutional Rights as Applied to Court-Martial Panels

Notwithstanding the deference afforded Congress to legislate on military matters, as noted above, military appellate courts have applied certain constitutional protections to courts-martial. Moreover, and especially relevant to the present issue, military appellate courts have imported certain *jury-specific* constitutional rights to court-martial panels.

   For example, the CAAF has held that an accused has a right to an impartial panel. On the Sixth Amendment right to an impartial panel, the CAAF held that "the Sixth Amendment requirement that the jury be impartial applies to court-martial members and covers not only the selection of individual jurors, but also their conduct during the trial proceedings and the subsequent deliberations." *United States v. Lambert*, 55 M.J. 293, 295 (C.A.A.F. 2001) (citations omitted). On the Fifth Amendment, the CAAF noted: "As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (citing *United States v. Mack*, 41 M.J. 51, 54 (C.M.A. 1994)); *see also United States v. Richardson*, 61 M.J. 113, 118 (C.A.A.F. 2005) ("As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel.").

   Moreover, the CAAF's predecessor reviewed and applied Supreme Court precedent on equal protection to racially discriminatory jury selection practices. *United States v. Santiago-Davila*, 26 M.J. 380, 389–90 (C.M.A. 1988). It noted that *Batson v. Kentucky*, 476 U.S. 79 (1986), was "not based on a right to a representative cross-section on a jury but, instead, on an equal-protection right to be tried by a jury from which no 'cognizable racial group' has been excluded." *Santiago-Davila*, 26 M.J. at 389–90 (C.M.A. 1988) (quoting *Batson*, 476 U.S. at 96). The *Santiago-Davila* court continued: "This right to equal protection is a part of due process under the Fifth Amendment; and so it applies

to courts-martial, just as it does to civilian juries." *Id.* at 390 (citations omitted).

### 6. Supreme Court Recognizes "Judicial" Nature of Courts-Martial

There used to be greater distinction between civilian criminal trials and military courts-martial. Recognizing this distinction, in 1974, the Supreme Court noted, "Just as military society has been a society apart from civilian society," so too is military law "a jurisprudence *which exists separate and apart from the law which governs in our federal judicial establishment*." *Parker v. Levy*, 417 U.S. 733, 744 (1974) (emphasis added) (citation omitted). The Court noted that the UCMJ "cannot be equated to a civilian criminal code." *Id.* at 749.

Times have changed, however—as evidenced by numerous updates to the UCMJ to add punitive offenses, the development of Military Rules of Evidence that largely mirror the Federal Rules of Evidence, and, as described above, the application of numerous constitutional trial rights to the courts-martial system. Recognizing these changes, in 2018, the Supreme Court stated:

> The jurisdiction and structure of the court-martial system likewise resemble those of other courts whose decisions we review. Although their jurisdiction has waxed and waned over time, courts-martial today can try service members for a vast swath of offenses, including garden-variety crimes unrelated to military service.

*Ortiz v. United States*, 138 S. Ct. 2165, 2174 (2018) (citations omitted).[13] The Court further noted that "[t]he sentences meted out are also similar: Courts-martial can impose, on top of peculiarly military discipline, terms of imprisonment and capital punishment." *Id.* at 2175 (citations omitted). A court-martial is, "'in the strictest sense' a 'court of law and justice'—'bound, like any court, by the fundamental principles of law' and the duty to adjudicate cases 'without partiality, favor, or affection.'" *Id.* at 2175–76 (quoting 2 W. WINTHROP, MILITARY LAW AND PRECEDENTS 54 (2d ed. 1896)). The Court thus recognized that "[t]he military justice system's essential character" is "in a word, judicial." *Id.* at 2174. The Court, in praising this judicial nature, stated, "It is in fact one of the glories of this country that the military justice system is so deeply rooted in the rule of law." *Id.* at 2176 n.5.

---

[13] Even 24 years before *Ortiz* was decided, the Supreme Court stated, "Congress has taken affirmative steps to make the system of military justice more like the American system of civilian justice . . . ." *Weiss*, 510 U.S. at 179.

### 7. Supreme Court's Ruling in *Ramos v. Louisiana*

In *Ramos v. Louisiana*, the Supreme Court held that the Sixth Amendment right to a jury trial, as incorporated against the states under the Fourteenth Amendment,[14] required a unanimous verdict for an accused charged with a serious offense. 140 S. Ct. at 1408.

Prior to the *Ramos* decision, Louisiana and Oregon were the only remaining states that allowed for nonunanimous jury verdicts, both allowing for a "10–2 verdict."[15] Yet Justice Gorsuch, delivering the opinion of the Court, explained:

> The text and structure of the Constitution clearly suggest that the term "trial by an impartial jury" carried with it *some* meaning about the content and requirements of a jury trial.

> One of these requirements was unanimity. Wherever we might look to determine what the term "trial by an impartial jury" meant at the time of the Sixth Amendment's adoption—whether it's the common law, state practices in the founding era, or opinions and treatises written soon afterward—the answer is unmistakable. A jury must reach a unanimous verdict in order to convict.

*Id.* at 1395.

In *Ramos*, the Supreme Court noted it had "commented on the Sixth Amendment's unanimity requirement no fewer than 13 times over more than 120 years." *Id.* at 1397. The Court then stated that "the Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the Fourteenth Amendment." *Id.* at 1397 (quoting *Duncan v. Louisiana*, 391 U. S. 145, 148–150 (1968)). The court concluded: "There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally." *Id.*

When the scope of *Ramos*' retroactivity was addressed in *Edwards v. Vannoy*,[16] the Supreme Court stated *Ramos* was a "momentous and consequential" decision—much like *Duncan v. Louisiana*, 391 U.S. 145 (1968); *Crawford v. Washington*, 541 U.S. 36 (2004); and *Batson v. Kentucky*, 476 U.S. 79 (1986)—as those cases "fundamentally reshaped criminal procedure throughout the

---

[14] U.S. CONST. amend. XIV.

[15] Prior to the *Ramos* decision, in 2018, Louisiana dispensed with the 10–2 verdict in favor of unanimous juries, but nonunanimous verdicts were allowed for cases prior to 2019. Oregon remained the only state allowing for nonunanimous juries. *Monea* at 73.

[16] *Edwards* held that *Ramos* does not apply retroactively on federal collateral review. 141 S. Ct. 1547, 1554 (2021).

United States and significantly expanded the constitutional rights of criminal defendants." 141 S. Ct. 1547, 1559 (2021).

In her dissent in *Edwards*, Justice Kagan stated that "the Court in *Ramos* termed the Sixth Amendment right to a unanimous jury 'vital,' 'essential,' 'indispensable,' and 'fundamental' to the American legal system," and noted the court had made "a fundamental change in the rules thought necessary to ensure fair criminal process." *Id.* at 1573–74 (Kagan, J., dissenting). Justice Kagan later cited to *In Re Winship*, 397 U.S. 358, stating that "*Winship* rested on an 'ancient' legal tradition incorporated in the Constitution" and "that a jury must find guilt "beyond a reasonable doubt," and "[a]s in *Ramos*, that tradition served to 'safeguard men' from 'unjust convictions, with resulting forfeitures' of freedom." *Id.* at 1576 (Kagan, J., dissenting) (quoting *Winship* 397 U.S. at 362). Justice Kagan continued:

> Allowing conviction by a non-unanimous jury impairs the purpose and functioning of the jury, undermining the Sixth Amendment's very essence. It raises serious doubts about the fairness of a trial. And it fails to assure the reliability of a guilty verdict. So when a jury has divided, as when it has failed to apply the reasonable-doubt standard, there has been no jury verdict within the meaning of the Sixth Amendment.

*Id.* at 1577 (alterations, internal quotation marks, and citations omitted).

### 8. Analysis—Sixth Amendment Right to a Jury Trial

For over 150 years, the Supreme Court and military appellate courts have consistently held that the Sixth Amendment right to a jury trial does not extend to trial by courts-martial. *See United States v. Wolff*, 5 M.J. 923, 924 (N.C.M.R. 1978) (first citing *United States v. Kemp*, 46 C.M.R. 152 (C.M.A. 1973); and then citing H. Moyer, *Justice and the Military*, § 2-585 (1972)). There can be no doubt that when *Ramos* was decided, most military practitioners considered this case a watershed moment in the administration of justice; the language Justice Gorsuch uses is unequivocal. Yet neither Justice Gorsuch, nor any of the concurring or dissenting justices, mentioned the potential effect of *Ramos* on the military justice system. Notwithstanding a servicemember's lack of Sixth Amendment right to a "jury trial," the member does enjoy a Sixth Amendment right to an "impartial panel." *See Lambert*, 55 M.J. at 295. Given the *Ramos* court's holding that a "trial by an impartial jury" required a unanimous verdict, one could find that an *impartial court-martial panel* similarly requires unanimity. However, there is nothing in the Court's majority opinion on whether *Ramos* has any effect on the military justice system. I do not believe this was an oversight. If the Supreme Court had wanted *Ramos* to apply to the

military, it could have said as much.[17] Although this specific issue may not have been squarely addressed by our superior courts—and indeed the CAAF may find that *Ramos* compels a finding that an "impartial court-martial panel" must be unanimous—I ultimately do not part from the long-standing precedent on the servicemember's lack of a Sixth Amendment right to a "jury trial."[18]

### 9. Analysis—Fifth Amendment and Equal Protection

Our deference to Congress on military matters is not absolute. Indeed, notwithstanding the fact that courts-martial are Article I courts, numerous trial rights have been guaranteed to servicemembers as *constitutional* rights.

Given that our military justice system is "judicial"—as described in *Ortiz*—I find the right to a unanimous verdict is a fundamental constitutional right, as articulated in *Ramos*.[19] As such, the denial of this right is subject to strict

---

[17] If one goes back to the Supreme Court's decision in *Ortiz* (decided less than two years prior to *Ramos*), in which the Court addressed its role in the military appellate review process, Justice Alito, dissenting, stated, "Our appellate jurisdiction permits us to review one thing: the lawful exercise of *judicial* power." *Ortiz*, 138 S. Ct. at 2190 (Alito, J., dissenting). Justice Alito then stated, "As currently constituted, military tribunals do not comply with Article III, and thus they cannot exercise the Federal Government's judicial power. That fact compels us to dismiss Ortiz's petition for lack of jurisdiction." *Id.* In the 7–2 ruling in *Ortiz*, the only person who agreed with Justice Alito was Justice Gorsuch. Two-and-a-half years later, in *United States v. Briggs*, Justice Gorsuch made it clear that he "continue[s] to think [the Supreme Court] lacks jurisdiction to hear appeals from the CAAF." 141 S. Ct. 467, 474 (2020) (Gorsuch, J., concurring). Logically, if Justice Gorsuch believed the Supreme Court did not have jurisdiction over the *Ortiz* or *Briggs* cases, then the Court would not have jurisdiction to address servicemembers' right to a jury, which may explain why he did not reference the military justice system in *Ramos*.

[18] *Stare decisis* encompasses two distinct concepts: (1) vertical *stare decisis*—the principle that courts "must strictly follow the decisions handed down by higher courts," and (2) horizontal *stare decisis*—the principle that "an appellate court[ ] must adhere to its own prior decisions, unless it finds compelling reasons to overrule itself." *United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (citation omitted). "We are not bound by precedent where 'there has been a significant change in circumstances after the adoption of a legal rule, or an error in legal analysis,' and we are 'willing to depart from precedent when it is necessary to vindicate plain, obvious principles of law and remedy continued injustice.'" *Id.* at 399 (citing 20 AM. JUR. 2D *Courts* § 127 (2018)).

[19] The Supreme Court in *Ramos* relied on the Sixth Amendment when holding that criminal defendants in serious cases enjoy the right to a unanimous verdict. *See Ramos*, 140 S. Ct. at 1397. Thus, it might appear unusual to deny relief on Sixth Amendment grounds then conduct an equal protection analysis. However, equal protection under the Fifth Amendment applies to various constitutional rights. *See, e.g., United*

scrutiny, and not rational basis. *See Begani*, 79 M.J. at 777 (noting that restrictions "burdening fundamental rights are subjected to strict scrutiny"). "Strict scrutiny analysis requires the challenged statute to serve a 'compelling governmental interest,' and the means taken to be 'narrowly tailored' to accomplish this goal." *Begani*, 79 M.J. at 793 (Crisfield, C.J., dissenting) (citing *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). As the dissent articulated in *Begani*, "I do not see any contradiction in performing a strict scrutiny analysis while providing Congress with great deference. Judicial deference does not mean abdication." *Id.* at 792 (internal quotation marks and citation omitted).[20]

What is the compelling governmental interest in justifying a nonunanimous panel verdict? In an unpublished opinion, one of our sister courts posited possible reasons:

---

*States v. Means*, 10 M.J. 162, 165 (C.M.A. 1981) (discussing equal protection analysis when applied to "an encroachment on fundamental constitutional rights like freedom of speech or of peaceful assembly").

[20] *Begani* involved the Navy's jurisdiction over reserve personnel. On congressional deference, the court stated:

> [I]t still strikes us as odd that in one scenario, Congress would be free to legislate based on the differences between the two dissimilar groups and courts would be satisfied with some rational reason for Congressional action, but in the present scenario, we would not only find the groups suddenly similar, but would be compelled to apply strict scrutiny.

> We also must keep in mind we are delving into "Congress' authority over national defense and military affairs, and perhaps no other area has the [Supreme] Court accorded Congress greater deference."

79 M.J. at 779 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981)). The Court continued:

> We look to the Supreme Court for guidance in whether to formally apply strict scrutiny analysis or to generally defer to Congress in military matters. *Rostker*, and other cases concerning the military, arose in more pure equal protection categories, such as sex discrimination, rather than cases more focused on the fundamental rights aspect of the equal protection component of the Due Process clause. But we believe the same sort of deference is due to Congress in military matters for equal protection challenges based on the deprivation of a fundamental right.

*Id.* at 780. It is worth noting that in its *Begani* opinion, the CAAF rejected the contention that the Sixth Amendment right to jury trial was implicated and that strict scrutiny should be applied. *Begani*, 81 M.J. at 280 n.2.

> [C]urrent practice helps reduce the possibility of impermissible influences on panel members both inside and outside the deliberation room. These pernicious concerns of improper influence will be most acutely felt when the case involves high stakes, when the case involves infamous acts, or when the personalities involved are less likely to yield to prophylactic instructions. That is, concerns of improper influence are most likely to be a problem in the most problematic of circumstances.

*United States v. Mayo*, ARMY 20140901, 2017 CCA LEXIS 239, at *22 (A. Ct. Crim. App. 7 Apr. 2017).

Due to "military life and custom," the court suggested that our system "allows a panel member to cast what they might perceive to be an unpopular vote," yet concluded a requirement of unanimity "would only frustrate the goal of deliberating until all panel members are in agreement. As a result, a requirement to keep deliberating until all members agree poses special concerns when one panel member outranks the other." *Id.* at *20.

Essentially, that panel was concerned about unlawful command influence. Perhaps the Government thus has an interest in nonunanimous panels, but the law concerning unlawful command influence is—supposedly—in place to protect an accused. "[T]o say that one protection for an accused servicemember is a reason to diminish another protection is a non-sequitur." *Dial* Ruling at 15 (full citation in n.8, *supra*).

Regardless of how one views the question of whether military members have a constitutional right to a unanimous verdict, the *Mayo* rationale as justification to deny servicemembers the right to a unanimous jury should give anyone pause about the fairness of the military justice system. The *Mayo* opinion on improper influence is contrasted by that espoused by a federal court of appeals:

> The dynamics of the jury process are such that often only one or two members express doubt as to [the] view held by a majority at the outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict. Both the defendant and society can place special confidence in a unanimous verdict, and we are unwilling to surrender the values of that mode of fact-finding, or to examine the constitutional implications of

an attempt to do so, absent a clear mandate in the Rules or a controlling statute.

*United States v. Lopez*, 581 F.2d 1338, 1341–42 (9th Cir. 1978). Justice Kavanaugh echoed some of this sentiment in his *Ramos* concurrence:

> Then and now, non-unanimous juries can silence the voices and negate the votes of black jurors, especially in cases with black defendants or black victims, and only one or two black jurors. The 10 jurors "can simply ignore the views of their fellow panel members of a different race or class."

*Ramos*, 140 S. Ct. at 1418 (Kavanaugh, J. concurring in part) (quoting *Johnson* v. *Louisiana*, 406 U. S. 356, 397 (1972) (Stewart, J., dissenting)).

Other potential reasons to preserve nonunanimous verdicts are perhaps expediency[21] or the ability to procure members to sit on panels—specifically at remote locations or in times of war or crisis. Also, a nonunanimous panel allows for the finality of a verdict, thus preventing hung juries. With respect to expediency, cases generally take much longer to get to trial than they did in 1950, especially when scientific testing of evidence is involved; it is not uncommon for a case to proceed to trial a year after the offense was committed. Regarding the procurement of members, this may have been a significant issue in 1950, but is not so in 2022, as it is not uncommon to travel servicemembers to sit on panels at other installations. Finally, as the military judge noted in *Dial*, and which I agree, when it comes to hung juries and re-voting, these are only issues "if either the Constitution or congressional legislation requires a unanimous vote to acquit." *Dial* Ruling at 15. Having considered these possible reasons, none warrant denial of equal protection regarding a unanimous verdict when viewed in context of the consequences of such a verdict.

That nonunanimous verdicts deprive servicemembers of equal protection under the law is further evidenced by cases—such as Appellant's—in which the crime lacks a specific military nexus and the military specifically requests prosecutorial jurisdiction from civilian authorities. Appellant's crime occurred in North Carolina. North Carolina officials "ceded" jurisdiction to military authorities. Appellant had a constitutional right to a unanimous jury in North

---

[21] In *Solorio,* dissenting, Justice Marshall wrote,

> [T]he concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government.

483 U.S. at 461 (quoting *Reid v. Covert*, 354 U.S. 1, 14 (1957) (plurality opinion).

Carolina; under longstanding military precedent, in a court-martial he did not. In other words, he had at least one less fundamental right in the military than had he been tried in North Carolina. It thus became easier to secure a conviction—and not just under the Louisiana/Oregon standard of 10–2, but under a standard of 6–2. The only significant connection between the military and the offenses at issue was the fact that Ms. SW was a military dependent. Thus, failing to require unanimous panel verdicts gives military prosecutors an advantage of constitutional proportions over their state and federal counterparts, making it easier for our system to secure convictions, and exposing the possibility of forum shopping among jurisdictions. While the Air Force maintains a position of "maximizing Air Force jurisdiction,"[22] unanimous panels would limit the prosecutorial advantage gained by obtaining jurisdiction in the military justice system.[23]

---

[22] Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 4.18.1 (18 Jan. 2019).

[23] Regarding issues of double jeopardy, Justice Alito stated it would be rare for a servicemember to be prosecuted for the same offense. "States usually have concurrent jurisdiction over such crimes when they are committed off base and sometimes possess jurisdiction over such offenses when committed on base. These offenses, however, are rarely prosecuted in both a military and a state court, and therefore when a servicemember is court-martialed for a sex offense over which the State had jurisdiction, this is usually because the State has deferred to the military." *United States v. Kebodeaux*, 570 U.S. 387, 404 (2013) (Alito, J., concurring in the judgment). For an example of a rare and extraordinary case, *see United States v. Hennis*, 79 M.J. 370 (C.A.A.F. 2020). Justice Alito also advised,

> Where an act or omission is subject to trial by court-martial and by one or more civil tribunals, the determination which nation, state, or agency will exercise jurisdiction is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused. Rule 201(d)(3). And as the commentary to Rule 201(d) explains, the determination which agency shall exercise jurisdiction should normally be made through consultation or prior agreement between appropriate military officials . . . and appropriate civilian authorities. [I]t is constitutionally permissible to try a person by court-martial and by a State court for the same act, however, as a matter of policy a person who is pending trial or has been tried by a State court should not ordinarily be tried by court-martial for the same act.

*Kebodeaux,* 570 U.S. at 405 n.2 (alterations in original) (internal quotation marks omitted) (Alito, J., concurring in the judgment).

### 10. Consequences of Denying Equal Protection

Some may argue that Congress, with the "exceptional" powers granted to it by the Constitution, can do what it wants with the military and thus choose to deny servicemembers the right to a unanimous verdict. I conclude that under our judicial system, Congress cannot do so.

However, if Congress has this power, it may be time to accept that a "conviction" in the military system is not equivalent to a state or federal conviction[24] and reevaluate the words spoken in *Parker*, that the military system is "a jurisprudence *which exists separate and apart from the law which governs in our federal judicial establishment.*" *Parker*, 417 U.S. at 744 (emphasis added) (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953)).

Even our "separate system," however, must review whether servicemembers' fundamental rights are being violated. "For the Government to make distinctions does not violate equal protection guarantees unless constitutionally suspect classifications like race, religion, or national origin are utilized or *unless there is an encroachment on fundamental constitutional rights* like freedom of speech or of peaceful assembly." *Means*, 10 M.J. at 165 (emphasis added) (citing *Oyler*, 368 U.S. at 446). *Ramos* constituted "a fundamental change in the rules thought necessary to ensure fair criminal process." *Edwards*, 141 S. Ct. at 1574 (Kagan, J., dissenting). By not having the right to a unanimous panel, what Congress defines as "fair criminal process" is very different from the federal and state systems.

Upon a military conviction, servicemembers may be subject to various post-trial proceedings and requirements. These include DNA processing required under 10 U.S.C. § 1565 and Department of Defense Instruction (DoDI) 5505.04;[25] firearms prohibition, triggered under 18 U.S.C. § 922; domestic violence ramifications under 18 U.S.C. § 922(g)(9); and sex offender notification

---

[24] *See Gourzong v. AG United States*, 826 F.3d 132, 137 (3d Cir. 2016) ("Courts are in wide agreement that convictions by general courts-martial receive the weight of equivalent convictions in the civilian system."); *see also United States v. Shaffer*, 807 F.3d 943, 948 (8th Cir. 2015) ("[W]e hold that Shaffer's conviction by general court-martial is a conviction in 'a court of the United States' within 18 U.S.C. § 3559(c).").

[25] Department of Defense Instruction (DoDI) 5505.14, *Deoxyribonucleic Acid Collection Requirements for Criminal Investigations, Law Enforcement, Corrections, and Commanders* (22 Dec. 2015, incorporating Change 2, 7 May 2021).

requirements, in accordance with DoDI 1325.07,[26] the latter of which I will focus on.

By virtue of Appellant's conviction, he will have to register as a sex offender in North Carolina. In 2006, Congress enacted the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20901 *et seq.*,[27] "a federal statute that requires those convicted of federal sex offenses to register in the States where they live, study, and work." *Kebodeaux*, 570 U.S. 387, 389 (2013).[28] Given that Congress can promulgate the UCMJ under U.S. CONST. art. I, § 8, cl. 14, it could "specify that the sex offense of which [the appellant] was convicted was a military crime under that Code." *Kebodeaux*, 570 U.S. at 395. Moreover, Congress could "punish that crime through imprisonment and by placing conditions upon [the appellant's] release" and "make the civil registration requirement at issue here a consequence of [the appellant's] offense and conviction." *Id.*

Under 18 U.S.C.S. § 2250(a), whoever

> (1) is required to register under the Sex Offender Registration and Notification Act;
>
> (2) (A) is a sex offender as defined for the purposes of the Sex Offender Registration and Notification Act by reason of a conviction under Federal law (*including the Uniform Code of Military Justice* [10 USCS §§ 801 et seq.]), the law of the District of Columbia, Indian tribal law, or the law of any territory or possession of the United States; or
>
> (B) travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country; and
>
> (3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act;
>
> shall be fined under this title or imprisoned not more than 10 years, or both.

---

[26] Department of Defense Instruction (DoDI) 1325.07, *Administration of Military Correctional Facilities and Clemency and Parole Authority* (11 Mar. 2013, incorporating Change 4, 19 Aug. 2020).

[27] SORNA has been transferred to 34 U.S.C. § 20901 *et seq.* from 42 U.S.C. § 16901.

[28] *Kebodeaux* involved a former Airman who was convicted of statutory rape in 1999 and thus subject to sex offender registration under the Wetterling Act, which was replaced by SORNA. The Court noted that "the fact that the federal law's requirements in part involved compliance with state-law requirements made them no less requirements of federal law." *Kebodeaux*, 570 S. Ct. at 393 (citations omitted).

(Emphasis added).

However, Congress's broad and "expansive power is constrained by the Fifth Amendment's guarantee of Due Process and the imputed guarantee of Equal Protection." *Begani*, 79 M.J. at 791 (Crisfield, C.J., dissenting). In terms of sex offender registration, SORNA considers a military conviction equal to a federal or state conviction. If a servicemember is denied a unanimous panel, it is not equal.

In Appellant's case, if he and a civilian were successfully prosecuted for the same sex crime in state or federal court with the benefit of a unanimous verdict, both would be similarly situated as both would be subject to the same SORNA requirements. However, if Appellant were tried and convicted under the UCMJ, and a civilian were tried and convicted in a civilian jurisdiction for the same sex crime, the civilian defendant would have the fundamental constitutional right to a unanimous verdict from 12 jurors. Appellant, on the other hand, would not only be denied a unanimous verdict, but could be convicted by as few as six persons. Both Appellant and the civilian, however, would face the same SORNA consequences. This is not equal protection under the law. I am convinced that servicemembers and civilians are similarly situated for purposes of equal protection analysis when it comes to evaluating nonunanimous verdicts and their consequences under SORNA.

SORNA is nothing to simply dismiss. Long after Appellant has served his confinement, the collateral consequences of his crimes will remain; sex offense registration may place significant qualifications and restrictions on his life and liberty for an indeterminate period of time. I go back to my dissent in *United States v. Palacios Cueto*, where I noted how appellant's convictions, along with the expansion of sex offender requirements in recent years, begs the question as to when the collateral consequences of such convictions look more like a punishment. No. ACM 39815, 2021 CCA LEXIS 239, at *64 n.3 (A.F. Ct. Crim. App. 18 May 2021) (unpub. op.) (Meginley, J., dissenting), *rev. granted on other grounds*, __ M.J. __, No. 21-0357, 2022 CAAF LEXIS 114 (C.A.A.F. 7 Feb. 2022). With the denial of such a fundamental right, coupled with a finding of guilty from as few as six out of eight people, SORNA implications as a result of a court-martial conviction appear to be more of a punishment than a mere collateral consequence. Finally, it is worth reiterating that DoDI 1325.07 makes it clear that Appellant will have to register as a sex offender. *See* DoDI 1325.07, Appendix 4 to Enclosure 2, Table 6, at 84.

While the vast majority of sexual assault cases are prosecuted in the general court-martial forum, there are some sex offense cases that are prosecuted in a special court-martial forum. Again, in these instances, servicemembers face sex offender registration under SORNA, yet, only *three out of four* panel members are needed to convict. In *Ballew v. Georgia*, Justice Blackmun noted

that a unanimous conviction by a five-person jury for a non-petty offense violated an accused's right to jury trial, and relying on empirical studies, concluded that

> [T]he purpose and functioning of the jury in a criminal trial is seriously impaired, and to a constitutional degree, by a reduction in size to below six members. We readily admit that we do not pretend to discern a clear line between six members and five. But the assembled data raise substantial doubt about the reliability and appropriate representation of panels smaller than six. Because of the fundamental importance of the jury trial to the American system of criminal justice, any further reduction that promotes inaccurate and possibly biased decision making, that causes untoward differences in verdicts, and that prevents juries from truly representing their communities, attains constitutional significance.

435 U.S. 223, 239 (1978).

If a sexual assault allegation is brought to a special court-martial, and a servicemember faces sex offender registration for an indeterminate period of time, this is not a petty offense.

### 11. Unanimous Verdict—Conclusion

In *Reid v. Covert*, the Supreme Court noted: "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." 354 U.S. 1, 21 (1957). The Court noted the military's jurisdiction was always intended "to be only a *narrow exception* to the normal and preferred method of trial in courts of law." *Id.* (emphasis added). Yet, the majority of the offenses committed by servicemembers are common law offenses and not military-specific offenses. Perhaps because the military often prosecutes non-military-specific offenses, the military justice system has evolved to incorporate many of the protections and safeguards of our civilian court counterparts.

The "judicial" nature of our system, *see Ortiz*, 138 S. Ct. at 2174–76, makes it difficult for Congress to demonstrate what particular need or objective it is trying to accomplish in the denial of this "fundamental right." Given the significant changes our military justice system has undergone over the last 15 years, and the amount of scrutiny we have received, some might say the only reason to maintain the current system of nonunanimous verdicts is to make it easier for the Government to secure convictions. Yet, are we concerned with convictions or justice?

In *Solorio*, the Supreme Court held that the military could try a service-member for a criminal offense even if the offense lacked a "service connection." 483 U.S. at 436. In his dissent, Justice Marshall stated:

> Unless Congress acts to avoid the consequences of this case, every member of our Armed Forces, whose active duty members number in the millions, can now be subjected to court-martial jurisdiction -- without grand jury indictment or trial by jury -- for *any* offense, from tax fraud to passing a bad check, regardless of its lack of relation to "military discipline, morale and fitness." Today's decision deprives our military personnel of procedural protections that are constitutionally mandated in trials for purely civilian offenses. The Court's action today reflects contempt, both for the members of our Armed Forces and for the constitutional safeguards intended to protect us all.

*Id.* at 467 (Marshall, J., dissenting) (citation omitted).

Justice Marshall's words have proven partly true. Fortunately, military members have been afforded numerous "procedural protections that are constitutionally mandated in trials for purely civilian offenses." *See id.* Although each servicemember takes an oath to support and defend the Constitution, a fundamental constitutional right is denied to those who are accused of a crime in our system. I have no doubt that some reading this opinion will be concerned about the consequences of imposing a unanimous verdict requirement for courts-marial; however, as Justice Gorsuch noted in *Ramos*: "Every judge must learn to live with the fact he or she will make some mistakes; it comes with the territory. But it is something else entirely to perpetuate something we all know to be wrong only because we fear the consequences of being right." 140 S. Ct. at 1408. The consequence of being right will not dilute or hamper or impede military justice; it will strengthen the integrity and fairness of our judicial system. I respectfully dissent.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court